# Exhibit B

Sheldon Eisenberger (SE-2021)
The Law Office of Sheldon Eisenberger
*Attorneys for Defendants Marshall Caro and Indii.com USE, LLC*
30 Broad Street, 27th Floor
New York, New York 10004
(212) 422-3843

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FIDELITY BROKERAGE SERVICES LLC,

                Plaintiff,

      -against-

MARSHALL CARO, WALTER RAQUET,
INDII.COM USE, LLC and BILL ROTHFARB,

                Defendants.

:  Case No. 10-CV-5893 (BSJ)

:  **DECLARATION OF MARSHALL**
:  **CARO IN OPPOSITION TO**
:  **MOTION FOR INTERPLEADER**
:  **AND RELATED RELIEF**

      Marshall Caro solemnly declares under penalty of perjury as follows:

      1.    I am a defendant in this action and I am a member and officer of defendant Indii.com USE, LLC ("Indii"). I submit this declaration in opposition to the motion of plaintiff Fidelity Brokerage Services, LLC ("Fidelity") seeking an order of interpleader and related injunctive relief pursuant to 28 U.S.C. §§1335 and 2361. I have personal knowledge of the facts set forth below.

      2.    At the outset, I wish to explain how Indii has been made to suffer undue prejudice at the hands of Fidelity and defendant Bill Rothfarb ("Rothfarb")--when the law, as I understand it, is absolutely clear that a judgment creditor of an individual cannot restrain the assets of a legally distinct entity, without an adjudication that the entity is the alter ego of the individual judgment debtor. Fidelity knows this and yet seeks to wash its hands clean of this matter in an attempt to limit its exposure with respect to its mishandling of this matter from its inception. The

{00017098.DOC}

inequitable result from Fidelity's actions is that Indii has been deprived the use of more than $750,000 solely because Fidelity improperly restrained these funds in the first place. By its application for interpleader and related relief, Fidelity seeks to perpetuate this injustice, which has crippled Indii's operations.

3. The lack of merit in Rothfarb's claim to restrain Indii's funds, given the fact that Rothfarb holds no judgment against Indii, and did not even serve Fidelity with an enforceable restraining notice, is described in the accompanying memorandum of law.

4. Indii should no longer be deprived of its funds, which are needed for its operations. Its seizure has placed a substantial strain on Indii's business operations. Moreover, Indii has been unable to utilize these funds for stock trades which has caused Indii to miss out on significant investment opportunities, which has caused even further losses to Indii.

### The Underlying Facts

5. Indii is in the business of carrying specialized messages between broker dealers, asset managers and hedge funds, through a form of instant messaging between trading desks. Indii was formed as a Delaware limited liability company on June 24, 2003. When the company was founded, there were only two members of the company--me and defendant Walter Raquet. However, the Indii operating agreement specifically contemplated the future admission of other strategic members, who were listed in Schedule 3 of the operating agreement. A copy of the original Indii operating agreement is annexed hereto as Exhibit A. Several of the strategic members listed in Schedule 3 later signed documents confirming their membership in the company. Upon information and belief, several of these strategic members may be citizens of the State of New York. As explained in the accompanying memorandum of law, this fact is highly relevant because Fidelity failed to properly plead the citizenship of Indii in its complaint.

It is my understanding that the citizenship of each individual member of a limited liability company controls for purposes of determining whether diversity of citizenship exists.

## The Fraudulent Judgment Against Me

6.    In the mid-1990's, Rothfarb obtained a judgment against me in connection with a New York state lawsuit that he had brought against me, and several other parties, concerning unpaid sales commissions purportedly owed to Rothfarb (the "Judgment"). A copy of the Judgment is annexed hereto as Exhibit B. Indii was not a party to the lawsuit or the Judgment.

7.    In reaching its decision in the state court bench trial, the state court made certain findings of fact and conclusions of law and directed the parties to settle a judgment in accordance with the decision. The decision did not provide a monetary amount for Rothfarb's recovery; rather, the decision provided the framework from which such a calculation could be made. A copy of the decision is annexed hereto as Exhibit C. Although Rothfarb prevailed in the lawsuit, the state court limited Rothfarb's claims for commissions to only 8 accounts, while Rothfarb had sought to have more than 20 accounts included in the calculation for damages.

8.    Thereafter, the parties had engaged in settlement discussions to come to a resolution as to the precise amount of the monies to which Rothfarb would be entitled pursuant to the decision. I presented a written proposal to Rothfarb on May 21, 2003 and Rothfarb did not submit any counter-proposal.

9.    In August 1993, Rothfarb submitted a Notice of Settlement to the state court. However, Rothfarb never served a copy of this Notice of Settlement upon me or my attorney. Rothfarb has since admitted in subsequent proceedings that he could not locate any proof of service of the Notice of Settlement. The above notwithstanding, upon information and belief, the proposed judgment contained in the Notice of Settlement falsely stated that the calculation

{00017098.DOC}3

contained therein was being submitted upon consultation with "the parties," as this language is contained in the Judgment. Further, the spreadsheet attached to the proposed judgment included claims and figurations for several customer accounts that were not included as part of the state court's decision.

10. The state court adopted Rothfarb's proposed judgment contained in the Notice of Settlement and issued the Judgment in the amount of $204,018.23 on August 19, 2003, but Rothfarb did not serve my attorney (nor did he serve me) with any notice of this Judgment until nearly 2 years later, at the end of March 1995.

11. Given the inaccuracies contained in Rothfarb's proposed judgment (which later became the Judgment), there is no conceivable way that I would not have submitted a counter-proposal Rothfarb's submission, had I been duly served with the Notice of Settlement. Indeed, as stated above, I already had prepared my own calculation several months prior to the Notice of Settlement and would have relied on this proposal in submitting a proposed counter-order to the state court.

12. I was not aware that the trial court had issued the Judgment until Rothfarb sent Notice of Entry to my then retired attorney, Hugh Fryer, on or about March 28, 2005--nearly two full years after the Judgment was issued. Although my attorney, Mr. Fryer, was retired at the time, I convinced him to file a Notice of Appeal on my behalf while I sought other counsel. A copy of the Notice of Appeal is annexed hereto as Exhibit D. I was living in Greenwich, Connecticut at the time and obtained Connecticut counsel who investigated the facts and New York law, and advised me that Rothfarb and his attorney had perpetrated a fraud on the New York state court. I presented these findings to Rothfarb and he agreed to vacate the judgment

and to submit our respective proposed calculations for the judgment amount to the state trial court.

13.     Rothfarb did not vacate the judgment as promised. Until earlier this year, I was completely unaware that Rothfarb had failed to vacate the judgment as he had agreed. Given the extreme passage of time during which I did not hear from Rothfarb or anyone else regarding the Judgment, I was under the impression that Rothfarb had vacated the judgment and abandoned the entire process, until March 2010, at which time Rothfarb began an action to domesticate the Judgment in Connecticut, where I reside.

14.     I intend to file a motion in New York state court to vacate the Judgment based, in part, on Rothfarb's fraudulent submission of the Notice of Settlement to the state court, falsely claiming that all parties had agreed to his proposed calculations.

## Facts Relating to Fidelity's Motion

15.     On or about February 5, 2010, Indii opened an account at Fidelity bearing account number. ###-##3272 (the "Indii Account"). The account is only associated with Indii which is legally distinct from and independent of me.

16.     I also maintain several personal brokerage accounts in my own name at Fidelity. These accounts are not associated with the Indii Account.

17.     According to the complaint, Fidelity received a letter from Rothfarb's attorney enclosing an Information Subpoena With Restraining Notice on July 20, 2010. The restraining notice explicitly stated that it related to the "Account of Marshall A. Caro, Defendant and Judgment Debtor..." Exhibit A to the Affidavit of Christian Jeri ("Jeri Aff.") attached to Fidelity's motion papers.

18. Several days later, Indii learned of the restraint on the Indii Account. Thus, on or about July 29, 2010, I contacted Fidelity on behalf of Indii, and objected to the restraint placed on the Indii Account inasmuch as Indii was not a judgment debtor of Rothfarb. Thereafter, on or about July 30, 2010, Fidelity wrote Rothfarb stating that Fidelity "had discovered" that Indii's account was a "Partnership account" and that this account "may be exempt" from the reach of the restraining notice. The letter stated that Fidelity would lift the restraint on the Indii Account unless Rothfarb obtained a court order within 5 days thereafter. However, while there is no dispute that the letter was referring to Fidelity lifting the restraint on the Indii Account (see Affidavit of Michael G. Shannon in Support of Fidelity's Motion for Preliminary Injunction, Temporary Restraining Order and Related Relief at ¶19, FN2), the letter accidentally referenced the account number of my own personal accounts.

19. By letter dated August 2, 2010, Rothfarb's counsel wrote Fidelity demanding that Fidelity confirm that the restraints on the Caro account and Indii Account would remain in full force and effect. Exhibit D to the Jeri Aff. This marked the first time that Rothfarb had ever requested that the Indii Account be restrained, though Rothfarb did not issue a new information subpoena with restraining notice for the Indii Account at that time.

20. On August 4, 2010, Rothfarb sought and obtained in state court a temporary restraining order enjoining Fidelity from lifting "any duly issued restraints upon any accounts…in which it appears judgment debtor Marshall Caro has an interest, including, but not limited to" the Indii Account and the Caro account referenced above. Exhibit F to the Jeri Aff. On the same date, Fidelity filed the instant interpleader action.

21.   On August 5, 2010, I timely served exemption claims on both Fidelity and Rothfarb in connection with the restrained accounts. Exhibit H to the Jeri Aff. To date, Rothfarb has not served any objections to the exemption claims.

22.   On August 26, 2010, Rothfarb withdrew the state court motion, and the temporary restraining order issued by the state court was vacated. Fidelity alleges that during the appearance in state court, Rothfarb served a new information subpoena with restraining notice in relation to the Indii Account. As set forth in the accompanying memorandum of law, this new information subpoena with restraining notice is fatally deficient for several reasons.

23.   Fidelity did not send out copies of the second restraining forms to me or Indii until September 3, 2010, and these documents were delivered to me via UPS delivery on September 7, 2010. Annexed hereto as Exhibit E is a copy of the UPS shipping confirmation for these documents. On September 8, 2010, I duly served exemption claims on Fidelity objecting to the restraints on the Caro and Indii accounts. Annexed hereto as Exhibit F is a copy of this exemption form.   To date, Rothfarb has not filed any objections to Indii's (or Caro's) exemptions.

24.   As set forth in the accompanying memorandum of law, neither the complaint, nor any claim made by Rothfarb, provide a basis to deprive Indii of its funds. Indii is not a judgment debtor and there has been no finding by any court that Indii is my alter ego. Thus, the requisite elements for interpleader, which require the presence of two legitimate competing claims, are not met in this case.

25.     Therefore. for the foregoing reasons and those set forth more fully in the accompanying memorandum of law, I respectfully request that the Court dismiss the action and direct the release of Indii's funds. plus interest, and deliver them to Indii forthwith.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 4th day of October, 2010, in Greenwhich. Connecticut.

Marshall Caro

# EXHIBIT A

ZGBLLP Draft; 1/27/2004

## LIMITED LIABILITY COMPANY AGREEMENT

of

## INDILCOM USE, LLC

THE INTERESTS of INDILCOM USE, LLC (the "COMPANY") REFERRED TO HEREIN ("INTERESTS") HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"). SUCH INTERESTS ARE BEING OFFERED AND SOLD ONLY TO FINANCIAL INSTITUTIONS THAT ARE "QUALIFIED INSTITUTIONAL BUYERS" (AS DEFINED IN RULE 144A) OR "ACCREDITED INVESTORS" (AS DEFINED IN REGULATION D) UNDER THE EXEMPTION PROVIDED BY SECTION 4(2) OF THE SECURITIES ACT.

A PURCHASER OF ANY INTEREST MUST BE PREPARED TO BEAR THE ECONOMIC RISK OF THE INVESTMENT FOR AN INDEFINITE PERIOD OF TIME (AND BY PURCHASING AN INTEREST SUCH PURCHASER SHALL BE DEEMED TO HAVE SO REPRESENTED TO THE COMPANY) BECAUSE THE INTERESTS HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT AND, THEREFORE, CANNOT BE SOLD UNLESS THEY ARE SUBSEQUENTLY REGISTERED OR AN EXEMPTION FROM REGISTRATION IS AVAILABLE. THERE IS NO OBLIGATION OF THE COMPANY TO REGISTER THE INTERESTS UNDER THE SECURITIES ACT.   IN ADDITION, THIS AGREEMENT CONTAINS ADDITIONAL PROHIBITIONS ON THE TRANSFER OF THE INTERESTS PROVIDED FOR HEREIN.

## Summary

The Members of Indii.com USE, LLC (the "Company") will be divided into three classes. The first class, consisting of Walter Raquet and Marshall Caro (the "Initial Members"), initially shall own 100% of the Company. The other two (2) classes are as follows: (i) the Class A members which may consist of the following institutions: Bank of America, Bear Stearns, Citibank, CS First Boston, Deutsche Bank, Goldman Sachs, J.P. Morgan Chase, Knight Equity Markets, L.P., Lehman Brothers, Merrill Lynch, Morgan Stanley, Prudential Equity Group, Inc., and UBS; and (ii) the Class B Members.

The Class A Members and the Class B Members (collectively, the "Strategic Members") will qualify either as "qualified institutional buyers" (as defined in Rule 144A) or "accredited investors" (as defined in Regulation D) and who are among the most active issuers of indications of trade messages. Each Class A Member will be entitled to receive 2% of the equity ownership of the Company and each Class B Member will be entitled to receive 0.5% of the equity ownership of the Company. In addition, the Strategic Members will participate in up to 31% of the Company's net earnings (assuming all of the institutions become members), based on usage among the Strategic Members. The issuance of ownership interests upon becoming a Class A Member or Class B Member shall dilute only the ownership interest of the Initial Members.

Each Strategic Member may acquire its interest in the Company in one of three ways:

1.  A lump sum cash payment of $80,000 to be paid by no later than January 31, 2004;

2.  Payment of $120,000, payable in 6 installments of $20,000 with the first payment to be made no later than January 31, 2004; or

3.  Payment of $180,000, payable from the profit participation otherwise due the Strategic Members at the time such profits would otherwise be distributed to such Strategic Member.

Each Class B Member shall select one of the above payment options and shall be required to pay one-quarter of the amounts indicated in items 1. – 3. above, at the same time(s) and in the same manner.

Each Strategic Member shall select a payment option at the time it executes the Company's Limited Liability Company Agreement.

Voting rights are acquired immediately upon signing the Company's Limited Liability Company Agreement.

Assuming all institutions become Members, the Initial Members will share 42.5% of the Company's net earnings, and the Strategic Members collectively will share 57.5% of the Company's net earnings.

Please contact Walter Raquet at 203-862-9398 with any questions or comments.

This Summary is not complete. Please carefully review the entire Limited Liability Company Agreement.

*WITNESSETH* ................................................................................................................................... *1*

*ARTICLE 1* ......................................................................................................................................... *1*

   *DEFINITIONS* ................................................................................................................................ *1*
     1.1    *Certain Definitions* ............................................................................................................ *1*
     1.2    *Form of Pronouns; Number; Construction* ......................................................................... *5*

*ARTICLE 2* ......................................................................................................................................... *5*

   *THE COMPANY* .............................................................................................................................. *5*
     2.1    *Name* ................................................................................................................................. *5*
     2.2    *Purpose of the Company* .................................................................................................... *5*
     2.3    *Term* ................................................................................................................................. *6*

*ARTICLE 3* ......................................................................................................................................... *6*

   *OFFICES* ....................................................................................................................................... *6*
     3.1    *Registered Office* .............................................................................................................. *6*
     3.2    *Principal Executive Office* ................................................................................................ *6*
     3.3    *Other Offices* .................................................................................................................... *6*

*ARTICLE 4* ......................................................................................................................................... *6*

   *INTERESTS OF MEMBER* .............................................................................................................. *6*
     4.1    *Members* ............................................................................................................................ *6*
     4.2    *Limited Liability* ............................................................................................................... *6*
     4.3    *Nature of Membership Interest; Agreement Is Binding Upon Successors* .............. *6*
     4.4    *Units of membership Interests; Certificates Evidencing Interests* ........................... *7*
     4.5    *Classes of Members.* ........................................................................................................ *7*
     4.6    *Voting Rights* .................................................................................................................... *9*
     4.7    *Resignation and Withdrawal of Members* ....................................................................... *11*
     4.8    *Members May Participate in Other Activities* ................................................................. *11*
     4.9    *Members Are Not Agents* ................................................................................................. *11*
     4.10   *Transactions of Members with the Company* ................................................................... *11*
     4.11   *Material Events* ................................................................................................................ *11*

*ARTICLE 5* ....................................................................................................................................... *12*

   *MEETINGS OF MEMBERS* ........................................................................................................... *12*
     5.1    *Place of Meeting.* ............................................................................................................. *12*
     5.2    *Meetings of Members* ....................................................................................................... *12*
     5.3    *Quorum* ............................................................................................................................ *12*
     5.4    *Waiver of Notice* .............................................................................................................. *12*
     5.5    *Action by Members Without a Meeting* ............................................................................ *12*
     5.6    *Record Date* ..................................................................................................................... *13*

*ARTICLE 6* ....................................................................................................................................... *13*

   *MANAGEMENT OF THE COMPANY* ........................................................................................... *13*
     6.1    *Board of Directors* ........................................................................................................... *13*
     6.2    *Limited Liability* ............................................................................................................... *14*
     6.3    *Number and Qualifications of Managers* ......................................................................... *14*
     6.4    *Election and Removal of Managers* .................................................................................. *14*

| | | |
|---|---|---|
| 6.5 | Vacancies; Resignations | 14 |
| 6.6 | Initial Directors | 15 |
| 6.7 | Compensation of Directors | 15 |
| 6.8 | Directors Engaging in Other Activities. | 15 |
| 6.9 | Transactions of Directors with the Company | 15 |
| 6.10 | Business Committee | 15 |
| 6.11 | Technology Committee | 15 |
| 6.12 | Management Committee | 15 |

**ARTICLE 7** ............... 16

MEETINGS OF BOARD OF DIRECTORS AND MANAGEMENT COMMITTEES ............ 16

| | | |
|---|---|---|
| 7.1 | Place of Meetings | 16 |
| 7.2 | Calling of Managers | 16 |
| 7.3 | Quorum; Participation in Meetings by Conference Telephone Permitted; Vote Required for Action | 16 |
| 7.4 | Waiver of Notice; Consent to Meeting | 17 |
| 7.5 | Action Without a Meeting | 17 |

**ARTICLE 8** ............... 17

OFFICERS ............... 17

| | | |
|---|---|---|
| 8.1 | General | 17 |
| 8.2 | Appointment and Removal | 17 |
| 8.3 | Chief Executive Officer | 18 |
| 8.4 | President | 18 |
| 8.5 | Vice Presidents | 18 |
| 8.6 | Secretary | 18 |
| 8.7 | Assistant Secretaries | 18 |
| 8.8 | Treasurer | 18 |
| 8.9 | Assistant Treasurers | 19 |

**ARTICLE 9** ............... 19

CAPITAL CONTRIBUTIONS ............... 19

| | | |
|---|---|---|
| 9.1 | Capital Contributions | 19 |
| 9.2 | Timing of Capital Contributions by Raquet. | 20 |
| 9.3 | Withdrawal or Reduction of Capital Contributions | 20 |
| 9.4 | No Interest Payable on Capital Contributions | 20 |
| 9.5 | Capital Accounts | 20 |

**ARTICLE 10** ............... 21

ALLOCATION OF PROFITS AND LOSSES; TAX AND ACCOUNTING MATTERS ............ 21

| | | |
|---|---|---|
| 10.1 | Allocations | 21 |
| 10.2 | Accounting Matters | 25 |
| 10.3 | Tax Status and Returns | 25 |

**ARTICLE 11** ............... 25

DISTRIBUTIONS ............... 25

| | | |
|---|---|---|
| 11.1 | Distributions | 25 |
| 11.2 | Form of Distributions. | 27 |
| 11.3 | Billings to Strategic Members | 27 |

| | | |
|---|---|---|
| 11.4 | Restriction on Distributions | 27 |
| 11.5 | Return of Distributions | 27 |
| 11.6 | Withholding from Distributions | 27 |
| 11.7 | 754 Election | 28 |

ARTICLE 12 ...... 28

RESTRICTIONS ON TRANSFER OF INTERESTS; ADMISSION OF MEMBERS ...... 28

| | | |
|---|---|---|
| 12.1 | Transfer of Interest | 28 |
| 12.2 | Preemptive Rights | 28 |
| 12.3 | Offer from Outside Party; Tag Along Rights | 28 |
| 12.4 | Put Rights of Strategic Members | 28 |
| 12.5 | Payment of Purchase Price | 31 |
| 12.6 | Admission of New Members | 31 |

ARTICLE 13 ...... 31

COMARKETING; CONNECTION TO INSTANT MESSAGING SYSTEM ...... 31

| | | |
|---|---|---|
| 13.1 | Co-Marketing | 31 |
| 13.2 | Connection to Instant Messaging Syst em | 31 |

ARTICLE 14 ...... 32

ACCOUNTING, RECORDS, REPORTING TO AND BY MEMBERS ...... 32

| | | |
|---|---|---|
| 14.1 | Books and Records | 32 |
| 14.2 | Delivery to Members and Inspection | 32 |
| 14.3 | Reports to Strategic Members | 33 |
| 14.4 | Filings | 33 |
| 14.5 | Bank Accounts | 33 |
| 14.6 | Accounting Decisions and Reliance on Others | 33 |

ARTICLE 15 ...... 34

DISSOLUTION AND LIQUIDATION ...... 34

| | | |
|---|---|---|
| 15.1 | Dissolution | 34 |
| 15.2 | Liquidation | 34 |
| 15.3 | Liabilities | 34 |
| 15.4 | Settling of Accounts | 35 |
| 15.5 | Distribution of Proceeds | 35 |
| 15.6 | Certificate of Cancellation | 35 |
| 15.7 | Certain Acquisitions | 35 |

ARTICLE 16 ...... 37

INDEMNIFICATION AND INSURANCE ...... 37

| | | |
|---|---|---|
| 16.1 | Indemnification: Proceeding Other Than by Company | 37 |
| 16.2 | Indemnification: Proceeding by Company | 37 |
| 16.3 | Mandatory Indemnification | 37 |
| 16.4 | Authorization of Indemnification | 37 |
| 16.5 | Mandatory Advancement of Expenses | 38 |
| 16.6 | Effect and Continuation | 38 |
| 16.7 | Insurance and Other Financial Arrangements | 38 |
| 16.8 | Notice of Indemnification and Advancement | 39 |
| 16.9 | Repeal or Modification | 39 |

*ARTICLE 17* ............................................................................................................................................... *39*

*SEAL*........................................................................................................................................................ *39*
 *17.1 Seal*.............................................................................................................................................. *39*

*ARTICLE 18* ............................................................................................................................................... *39*

*INVESTMENT REPRESENTATIONS; PRIVATE OFFERING EXEMPTION*........................ *39*
 *18.1 Investment Representations* ........................................................................................... *40*
 *18.2 No Advertising*.............................................................................................................. *40*
 *18.3 No Registration of Units* ............................................................................................ *40*
 *18.4 No Obligation to Register* .......................................................................................... *40*

*ARTICLE 19* ............................................................................................................................................... *41*

*DEFAULTS AND REMEDIES* ............................................................................................................... *41*
 *19.1 Defaults* ......................................................................................................................... *41*
 *19.2 Remedies* ....................................................................................................................... *41*

*ARTICLE 20* ............................................................................................................................................... *41*

*MISCELLANEOUS*.................................................................................................................................. *41*
 *20.1 Entire Agreement* ........................................................................................................ *41*
 *20.2 Amendments* ................................................................................................................. *41*
 *20.3 No Waiver*...................................................................................................................... *41*
 *20.4 Third Parties*................................................................................................................ *42*
 *20.5 Severability* .................................................................................................................. *42*
 *20.6 Governing Law*............................................................................................................. *42*
 *20.7 Arbitration*.................................................................................................................... *42*
 *20.8 Notices*........................................................................................................................... *42*
 *20.9 Titles and Subtitles* ..................................................................................................... *43*
 *20.10 Currency*...................................................................................................................... *43*
 *20.11 Counterparts* .............................................................................................................. *43*

## LIMITED LIABILITY COMPANY AGREEMENT

### of

### INDII.COM USE, LLC

THIS LIMITED LIABILITY COMPANY AGREEMENT is made and entered into as of June 24, 2003 by and among INDII.COM USE, LLC, a Delaware limited liability company (the "Company"), and the several persons and entities whose names and addresses are set forth in Schedule 1 hereto and whose signatures appear on the counterpart signature pages attached hereto.

### WITNESSETH

*WHEREAS*, each of the Initial Members has contributed or has agreed to make future capital contributions as provided for in Section 9.2 hereof, as set forth beside each Member's name on Schedule 1 annexed hereto;

*WHEREAS*; the Class A Members and Class B Members have contributed to the capital of the Company or have agreed to so contribute, as provided for in Section 9.1(b) hereof;

*WHEREAS*, the parties agree that their respective rights, powers, duties and obligations as Members of the Company, and the management, operations and activities of the Company, shall be governed by this Agreement; and

*WHEREAS*, the Members desire to be bound by this Agreement pursuant to the terms hereof.

*NOW, THEREFORE*, in consideration of the mutual terms, covenants and conditions contained herein, the parties hereby agree as follows:

### ARTICLE 1

### DEFINITIONS

1.1     *Certain Definitions.*  Capitalized terms used in this Agreement without other definition shall, unless expressly stated otherwise, have the meanings specified in this Section:

(a)     *"Act"* means Title 6 Chapter 18 of the Delaware Code, as from time to time in effect in the State of Delaware, or any corresponding provision or provisions of any succeeding or successor law of such State; provided, however, that in the event that any amendment to the Act, or any succeeding or successor law, is applicable to the Company only if the Company has elected to be governed by the Act as so amended or by such succeeding or successor law, as the case may be, the term "Act" shall refer to the Act as so amended or to such succeeding or successor law only after the appropriate election by the Company, if made, has become effective.

(b)     *"Actions Requiring Approval"* means the matters specified in Section 4.6(b) as requiring Member approval.

1527-001 #38522/v11

(c) *"Affiliate"* means any Person, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with such Person. The term "control", as used in the immediately preceding sentence, means with respect to a corporation, limited liability company, limited life company or limited duration company (collectively, "limited liability company"), the right to exercise, directly or indirectly, more than fifty percent (50%) of the voting rights attributable to the controlled corporation or limited liability company and, with respect to any individual, partnership, trust, estate, association or other entity, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity.

(d) *"Agreement"* means this Limited Liability Company Agreement, as originally executed and as amended, restated, modified or supplemented from time to time. Words such as "herein," "hereinafter," "hereof," "hereto," "hereby" and "hereunder", when used with reference to this Agreement, refer to this Agreement as a whole, unless the context otherwise requires.

(e) *"Assignee"* means any transferee of a Member's Interest who has not been admitted as a Member of the Company in accordance with Article 12.

(f) *"Bankruptcy"* means, with respect to a Member: such Member makes an assignment for the benefit of creditors; such Member files a voluntary petition in bankruptcy; such Member is adjudged a bankrupt or insolvent, or has entered against him or it an order for relief, in any bankruptcy, insolvency or suspension of payments proceeding; such Member files a petition or answer seeking for himself or itself any reorganization, arrangement, composition, readjustment, liquidation, dissolution, suspension of payments or similar relief under any statute, law or regulation; such Member files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against him or it in any proceeding of a nature described in this Section; such Member seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Member or of all or any substantial part of his or its properties; or 120 days after the commencement of any proceeding against the Member seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, suspension of payments or similar relief under any statute, law or regulation, if the proceeding has not been dismissed, or if within 90 days after the appointment without the Member's consent or acquiescence of a trustee, receiver or liquidator of the Member or of all or any substantial part of his or its properties, the appointment is not vacated or stayed, or within 90 days after the expiration of any such stay, the appointment is not vacated.

(g) *"Board of Directors"* means Persons who are elected to the Board of Directors of the Company pursuant to Section 6.4(a) of this Agreement.

(h) *"Business Committee"* means the Persons who are approved as members of the Business Committee pursuant to Section 6.10 of this Agreement.

(i) *"Capital Account"* means an account established and maintained (in accordance with, and intended to comply with, Income Tax Regulations Section 1.704-1(b)) for each Member pursuant to Section 9.5 hereof.

(j) *"Capital Contributions"* means the contributions made by the Members to the Company pursuant to Sections 9.1, 9.2, or 9.3 hereof and, in the case of all the Members, the aggregate of

1527-001 #38522/v1 1                                    2

all such Capital Contributions as set forth on Schedule 1 annexed hereto.

(k)     *"Certificate of Formation"* means the certificate of formation of this Company filed with the Delaware Secretary of State on June 24, 2003.

(l)     *"Change of Control"* means the (i) merger, consolidation, reorganization (or similar transaction or series of related transactions) of the entity into or with another entity that results in the exchange of outstanding securities of the entity for securities or other consideration issued or paid or caused to be issued or paid by any such entity or affiliate thereof in which the security holders of the entity immediately prior to such transaction shall own less than fifty percent (50%) of the voting securities of the surviving or continuing entity (or its parent) immediately after such transaction, or (ii) sale, transfer or other disposition (but not including a transfer of disposition by pledge or mortgage to a bona fide lender) of all or substantially all of the assets of the entity.

(m)     *"Class A Members"* means the class of Members who hold Class A Units which may initially consist of the following institutions: Bank of America, Bear Stearns, Citibank, CS First Boston, Deutsche Bank, Knight Equity Markets, L.P., Goldman Sachs, J.P. Morgan Chase, Lehman Brothers, Merrill Lynch, Morgan Stanley, Prudential Equity Group, Inc., and UBS.

(n)     *"Class B Members"* means the class of Members who hold Class B Units which may initially consist of RBC.

(o)     *"Class A Units"* means the units of ownership Interest in the Company held by the Class A Members as described herein.

(p)     *"Class B Units"* means the units of ownership Interest in the Company held by the Class B Members as described herein.

(q)     *"Code"* means the United States Internal Revenue Code of 1986, as amended, or any corresponding provision or provisions of any succeeding law and, to the extent applicable, the Income Tax Regulations.

(r)     *"Company"* means Indii.com USE, LLC, a Delaware limited liability company.

(s)     *"Dissolution Event"* means, with respect to any Person, one or more of the following: the death, insanity, withdrawal, resignation, retirement, expulsion, Bankruptcy or dissolution of such Person.

(t)     *"Income Tax Regulations"* means, unless the context clearly indicates otherwise, the regulations in force as final or temporary that have been issued by the U.S. Department of the Treasury pursuant to its authority under the Code, and any successor regulations.

(u)     *"Initial Member"* means Walter Raquet and Marshall Caro, who shall initially be the sole members of the Company.

(v)     *"Initial Units"* means the units of ownership Interest in the Company held by the Initial Members as described herein.

(w)      *"Interest"* means the entire ownership interest of a Member in the Company at any particular time, including, without limitation, such Member's Ownership Interest, Voting Interest, Profits Interest, and any and all rights and benefits to which a Member may be entitled pursuant to this Agreement and under the Act, together with the obligations of such Member to comply with all the terms and provisions of this Agreement and the Act.

(x)      *"License Agreement"* means that certain License Agreement between the Company and Indii.com, LLC, a Delaware limited liability company controlled by Raquet and Caro ("ICLLC"), pursuant to which the Company is granted by Indii.com, LLC a license in connection with certain intellectual property which forms the basis of the Company's operating capabilities, a copy of which is annexed hereto as Exhibit A.

(y)      A "Material Event" means (i) a transaction involving a Change of Control or (ii) the initial public sale of the Company's equity securities pursuant to a transaction registered under the Securities Act of 1933, as amended.

(z)      *"Member"* means (i) any Person who is a party to this Agreement listed in Schedule 1, whether denominated an Initial Member, a Class A Member, or a Class B Member, or (ii) has been admitted to the Company as a Member in accordance with the Act and this Agreement; in each case, provided that such Member has not become the subject of a Dissolution Event or ceased to be a Member for any reason.

(aa)     *"Net Profits"* and *"Net Losses"* means the income, gain, loss, deductions, credits and similar items of the Company determined in accordance with the Company's method of accounting at the close of each fiscal year (not including any amounts specially allocated under Sections 10.1(c)–10.1(l)) or for such shorter period as may be determined by the Board of Directors.

(bb)     *"Ownership Interest"* means the equity percentage of the Company owned by a Member, exclusive of the Profits Interest and Voting Interest.

(cc)     *"Profits Interest"* means the profits interest of a Member of the Company to share in the Net Profits and Net Losses in accordance with the terms of this Agreement. The Profits Interest to be shared by all Strategic Members, as a group, based on the "Billing Percentage" (as defined herein) shall be referred to as the *"Profits Pool"*. The size of the Profits Pool shall be determined by the number of Strategic Members who become Members and is set forth on Schedule 3 annexed hereto.

(dd)     *"Person"* means a natural person, partnership (whether general or limited and whether domestic or foreign), limited liability company, foreign limited liability company, limited life company, limited duration company, trust, estate, association, corporation, custodian, nominee or any other individual or entity in its own or any representative capacity or any other entity.

(ee)     *"Secretary of State"* means the Secretary of State of the State of Delaware.

(ff)     *"Service Agreement"* means that certain Service Agreement between the Company and each Member that sets forth the terms of usage in connection with the Company's instant messaging system, including, without limitation, the pricing for the use of the Company's instant messaging system, a copy of which is annexed hereto as Exhibit B.

4

(gg) *"Strategic Members"* shall mean, collectively, the Class A Members and the Class B Members.

(hh) *"Tax Matters Member"* has the meaning set forth in Section 10.3(c) hereof.

(ii) *"Tax Distribution"* has the meaning set forth in Section 11.1(b).

(jj) *"Technology Committee"* means the Persons who are appointed as members of the Technology Committee pursuant to Section 6.11 of this Agreement.

(kk) *"Transaction Documents"* means, collectively, this Agreement and any other agreements entered into in connection therewith.

(ll) *"Unit"* means a unit representing the entire Interest in the Company (that may be represented by a certificate issued by the Company), which is described in Section 4.4 hereof.

(mm) *"Vote"* includes written consent.

(nn) *"Voting Interest"* means one (1) Voting Interest for each Unit held by a Member, which allows a Member to vote on any matter provided for herein, as the same be amended from time to time pursuant to this Agreement.

1.2    *Form of Pronouns; Number; Construction.* Unless the context otherwise requires, as used in this Agreement, the singular number includes the plural and the plural number may include the singular. The use of any gender shall be applicable to all genders. Unless otherwise specified, references to Sections or Articles are to the Sections or Articles in this Agreement. Unless the context otherwise requires, the term "including" shall mean "including, without limitation."

## ARTICLE 2

## THE COMPANY

2.1    *Name.* The name of the Company shall be INDII.COM USE, LLC.

2.2    *Purpose of the Company.* The Company is organized for the following purposes:

(a)    enter into the License Agreement with ICLLC solely in connection with U. S. equities dated as of the date hereof;

(b)    to engage in any lawful activity for which a limited liability company may be formed under the Act; and

(c)    for such other activities directly related to and in furtherance of the foregoing business as may be necessary, advisable, or appropriate, in the reasonable opinion of the Board of Directors.

2.3     *Term.*    Subject to earlier dissolution pursuant to the Act or Section 15.1 of this Agreement, this Company shall continue in existence perpetually.

## *ARTICLE 3*

### *OFFICES*

3.1     *Registered Office.*  The registered office of the Company in Delaware required by the Act shall be as set forth in the Company's Certificate of Formation until such time as the registered office is changed in accordance with the Act.

3.2     *Principal Executive Office.*  The principal executive office for the transaction of the business of the Company shall be fixed by the Board of Directors within or without the State of Delaware.

3.3     *Other Offices.*  The Board of Directors may at any time establish other business offices within or without the State of Delaware.

## *ARTICLE 4*

### *INTERESTS OF MEMBERS*

4.1     *Members.* Each of the parties to this Agreement, and each Person admitted as a Member of the Company pursuant to the Act and this Agreement, shall be Members of the Company until they cease to be Members in accordance with the provisions of the Act, the Certificate of Formation or this Agreement. Upon the admission of any new Member, the schedules attached hereto shall be automatically deemed to be amended accordingly. The admission of any Member (other than the Initial Members) shall only occur on the first day of a month.

4.2     *Limited Liability.* Except as expressly set forth in this Agreement or required by law, and notwithstanding anything to the contrary contained in Section 10.1(a) hereof, no Member shall be personally liable for any debt, obligation or liability of the Company, whether arising in contract, tort or otherwise, solely by reason of being a Member of the Company. Notwithstanding anything to the contrary, under all circumstances, each Member's sole liability to the Company shall be to fund its capital contributions set forth on Schedule 1 or in Section 9.1(b) hereof irrespective of whether or not any Member shall at any time have a negative balance in its Capital Account. For the avoidance of any doubt, at no time during the term of the Company or on dissolution and liquidation thereof shall a Member with a negative balance in his, her or its Capital Account have any obligation to the Company or the other Members to restore such negative balance.

4.3     *Nature of Membership Interest; Agreement Is Binding Upon Successors.*

(a)     The Interests of Members in the Company constitute their personal estate. No Member has any interest in any specific asset or property of the Company.

(b)     In the event of the death or legal disability of any Member that is a natural person, the executor, trustee, administrator, guardian, conservator or other legal representative of such Member may exercise the rights and powers of that Member and shall be bound by all of the provisions of this Agreement. If a Member which is not a natural person is dissolved or terminated or changes its legal form or organization, the successor or legal representative of such Member may exercise the rights and powers of that Member and shall be bound by all of the provisions of this Agreement.

4.4     *Units of Membership Interests; Certificates Evidencing Interests.* The Company is authorized to issue a total of 100 Units which may be any combination of Initial Units, Class A Units or Class B Units; provided that, at all times there shall be outstanding 100 Units. Initially, all 100 Units shall be held by the Initial Members. Upon the admittance of a Class A Member (in accordance with the provisions of Section 4.5(d) hereof), without any further action on the part of the Members, the Initial Members shall be diluted by two (2) Units and the Company shall be obligated to issue two (2) Class A Units. Upon the admittance of a Class B Member, without any further action on the part of the Members, the Initial Members shall be diluted by one-half (0.5) Initial Unit and the Company shall be obligated to issue one-half (0.5) Class B Unit. *The Company hereby undertakes to issue (or has issued solely with respect to the Initial Units) to each Member listed on Schedule 1 (as such schedule shall be amended from time to time), the number of Units set forth opposite such Member's name in the column headed "Units".* All of such issued Units are validly issued, fully paid and non-assessable. The Company may issue to every Member a certificate signed by any two members of the Board of Directors of the Company specifying the interest or Units of such Member, which signatures may be facsimiles.

4.5     *Classes of Members.*

(a)     *General.* The Initial Members that are signatories of this Agreement shall be Initial Members, and upon the execution of this Agreement and payment of the applicable consideration set forth herein (or undertaking with respect thereto), each new Member shall become either a Class A Member, or a Class B Member, as the case may be. Each such class of Members shall have the applicable rights, powers, duties, obligations, preferences and privileges set forth in this Agreement. The names of the Members of each such class of Members shall be set forth in Schedule 1 hereto (as such Schedule shall be amended from time to time). Members of one class may also be Members of other classes.

(b)     *Classes of Members.* Each Member shall be entitled to share in the income, gain, loss, deduction and credit of the Company (and items thereof) as set forth in Article 10, to receive distributions as set forth in Article 11, and to receive proceeds upon a dissolution and liquidation of the Company in accordance with Article 15.

(c)     *Interests.*

(1)     The Initial Members shall be Raquet and Caro and until any other Strategic Member shall be admitted each of them shall own 50% of the Ownership Interests, 50% of the Voting Interests and 50% of the Profits Interests.

(2)     Upon the admittance of each Class A Member, the Class A Member shall receive two Units and shall be entitled to two (2) Voting Interests and two (2) Ownership Interests, and each Initial Member shall be diluted by one (1) Unit and by one (1) Voting Interest

and one (1) Ownership Interest. Upon the admittance of each Class B Member, the Class B Member shall be entitled to one-half of a Unit and to one-half (0.5) Voting Interests and one-half (0.5) Ownership Interest, and each Initial Member shall be diluted by one-quarter (0.25) of a Unit and one-quarter (0.25) Voting Interest and one-quarter (0.25) Ownership Interest.

(3)     Assuming all of the financial institutions eligible to become Class A Members and Class B Members become Strategic Members, the Initial Members shall own collectively 73.50 Units and shall have 73.50 Voting Interests and 73.50 Ownership Interests, the Class A Members shall own collectively 26.00 Units and have 26.00 Voting Interests and 26.00 Ownership Interests, and the Class B Members shall own collectively 0.50 Unit and shall have 0.50 Voting Interest and 0.50 Ownership Interest. A Member's Voting Interest and Ownership Interest shall be equal to the number of Units held by such Member (including fractional interests thereof) on all matters.

(4)     Upon the consummation of a Material Event, the Ownership Interest and the Voting Interest of the Initial Members shall be further diluted by an amount equal to the Profits Pool and the collective Ownership Interests and Voting Interests of the Strategic Members shall be increased by such amount. Each Strategic Member's Ownership Interest and the Voting Interest associated with such Profits Pool shall be allocated among the Strategic Members based on each Strategic Member's Billing Percentage (as such term is defined in Section 10.1(b) (vi) hereof) for the twelve (12) months immediately preceding the quarter in which the Material Event occurs (or such shorter period if any Material Event should occur prior to the completion of four quarters from and after the date of this Agreement).

(5)     Upon the admittance of any Strategic Member (or withdrawal or resignation of a Strategic Member or transfer of a Strategic Member's Interest), the Initial Members Profits Interest shall be equal to the difference between their Ownership Interest *less* the then applicable Profits Pool (after giving effect to such admittance or such resignation, withdrawal, or transfer or reduction) and the Strategic Members Profits Interest shall be equal to the sum of their Ownership Interest *plus* the Profits Pool (after giving effect to such admittance or such resignation, withdrawal, or transfer or reduction).

(d)     *Strategic Members.* Upon admittance of any Class A Member or Class B Member, as the case may be, the issuance of the Class A Units or the Class B Units, as the case may be, to such Class A Member or such Class B Member shall dilute only the Interest of the Initial Members and shall not dilute the Interests of the other Member, if any. The Chief Executive Officer shall have the right to offer financial institutions (other than those listed on Schedule 1) the opportunity to become a Strategic Member, whether or not all financial institutions listed on Schedule 1 become Strategic Members. A Strategic Member shall be admitted as a Member upon the execution of this Agreement and upon undertaking to make a Capital Contribution in the manner set forth in Section 9.1(b) hereof.

Each Strategic Member shall be entitled to exercise its voting rights upon becoming a Member in accordance with Section 9.1(b) hereof, at which time the following shall occur:

(1)     such Class A Member shall be issued two (2) Units representing each Class A Member's Interest; and in the case of each Class B Member, such Class B Member shall be issued one-half a Unit representing such Class B Member's Interest.

8

(2)     the Interest of the Initial Members shall be diluted by the issuance of the Units to the Class A Members and the Class B Members as provided for in clause (1) of this Paragraph and the Interest of the Initial Members shall automatically be adjusted *pro rata* to reflect such dilution;

(3)     for purposes of calculating the Members' Capital Accounts, (i) the Capital Accounts of the Members, other than the new Strategic Members shall be adjusted to reflect the then fair market value of the Company's assets pursuant to Section 9.5(b); (ii) no gain or loss shall be recognized to the Company on the admittance of the new Strategic Members; and (iii) the Capital Account of the new Strategic Members be equal to the consideration paid or agreed to be paid; and

(4)     each Strategic Member shall be entitled to a Voting Interest as set forth in Section 4.5(c) hereof.

(e)     *Additional Classes.* In the event that, in accordance with Sections 4.6, additional classes are authorized, the parties shall amend this Agreement to set forth (i) such additional class, (ii) the rights, powers, duties, obligations, preferences and privileges of each such class in relation to each other class and (iii) the manner in which each Member of such additional class shall be entitled to share in the income, gain, loss, deduction and credit and the degree to which such class shall be entitled to share in the relevant class investments and in the investments of the Company as a whole.

(f)     *Reserve Account.* In order to meet the ongoing needs of the Company, from and after the date any Member other than the Initial Members is admitted as a Member, the Members hereby agree that the Company shall maintain a reserve account (the "Reserve Account") of not more than $2.0 million from the Capital Contributions made by any Member pursuant to the provisions of Section 9.1(b)(iii) hereof, provided, however, that the Board of Directors may from time-to-time or at any time change the size of such Reserve Account. In the event that the Board of Directors at any time determined that the Reserve Account is insufficient to meet the Company's needs, the Board of Directors is hereby authorized to withhold from all Members an amount equal to 50% of the Net Profits of the Company until such time as the Board of Directors shall determine that the funds in the Reserve Account are sufficient to meet the needs of the Company.

(g) .     *Interests of Additional Members.* In the event that any Member is admitted to the Company other than the Initial Members, the Strategic Members, the Interests of such new Member shall dilute the Interests of all existing Members proportionally.

(h)     *Capital Call.* All Capital Contributions required from the Members are set forth in this Agreement. In no event shall any additional Capital Contributions or capital calls be required from any Member.

4.6     *Voting Rights.*

(a)     Except as may otherwise be provided in this Agreement, each of the Members shall have the right to vote on any of the matters set forth in Section 4.6(b). The voting rights contained

herein shall be the exclusive voting rights of the Members and shall be in lieu of any and all voting rights except those voting rights specifically required by the Act.

(b)     The affirmative vote of Members holding a majority of the Voting Interests voting as one class ("Requisite Voting Interest") shall be required to:

(i)     amend the Certificate of Formation;

(ii)     amend this Agreement (other than amending Schedule 1), including without limitation, altering or changing the rights, preferences or privileges of existing Members and Units or creating new classes of Members and Units with rights, preferences or privileges that are *pari passu* with or senior to the rights, preferences or privileges of existing Members and Units;

(iii)     approve the sale of Units and the admission of a Member, other than as specifically provided for herein;

(iv)     change the authorized number of members of the Board of Directors in accordance with Section 6.3;

(v)     approve a Material Event (in which case, the Initial Members Voting Interest shall be diluted and the Strategic Members' Voting Interest increased as provided in Section 4.5(c));

(vi)     approve a merger or consolidation that is not a "Material Event" or a conversion of the Company;

(vii)     approve any fundamental change in the business of the Company or transfer or conveyance of the assets of the Company or any of its subsidiaries other than in the ordinary course of business, if such transfer or conveyance, either individually or in the aggregate, exceeds $1,000,000; in all cases other than a Material Event;

(viii)     approve a voluntary dissolution of this Company pursuant to Section 15.1;

(ix)     agree to continue the business of the Company after a Dissolution Event specified in Section 15.1;

(x)     appoint a liquidating trustee in accordance with Section 15.2(a);

(xi)     to remove the Chief Executive Officer or the President; and

(xii)     approve the decision to elect to be governed by changes in the Act;

The actions specified in clauses (i) through (xii) above are collectively referred to as the "Actions Requiring Approval".

(c)     A record date for the determination of the Members entitled to receive notice of and to vote at a meeting shall be fixed as provided in Section 5.6. Each Member entitled to vote on any matter shall be entitled to one vote for each Unit (or fractional vote for fractional Units), if any, held by such Member. Such vote may be *viva voce*, by ballot or by written consent.

4.7     *Resignation and Withdrawal of Members.* A Member may resign or withdraw as a Member prior to the dissolution and winding up of the Company, by giving written notice to the Company. Upon such resignation and withdrawal such Member shall cease to be a Member, forfeit all of its Interest in the Company and such withdrawn Member shall have no further Interest in the Company and its sole right shall be to receive its Capital Account balance, as of the effective date of its resignation or withdrawal, upon the first to occur of (A) such time that the Reserve Account would be fully funded (after giving effect to such payment) as determined by the Board of Directors, in its sole discretion, (B) or the first anniversary of the effective date of such resignation or withdrawal. The Interests (excluding the interests in the Profits Pool which shall be forfeited) in respect of any Member who shall resign or withdraw shall be allocated, *pro rata*, solely to the Initial Members.

4.8     *Members May Participate in Other Activities.* Each Member, either individually or with others, shall have the right to participate in other business ventures of every kind. No Member, acting in his or its capacity as a Member, shall be obligated to offer to the Company or to the other Members any opportunity to participate in such other business venture. Neither the Company nor the other Members shall have any right to any income or profit derived from any such other business venture of a Member.

4.9     *Members Are Not Agents.* Pursuant to Section 6.1 of this Agreement, the management of the Company is vested in the Board of Directors. The Members shall have no power to participate in the management of the Company except as expressly authorized by the Act, this Agreement or the Certificate of Formation. No Member, acting solely in his or its capacity as a Member, is an agent of the Company nor does any Member, unless expressly and duly authorized in writing to do so by the Board of Directors, have any power or authority to bind or act on behalf of the Company in any way, to pledge its credit, to execute any instrument on its behalf or to render it liable for any purpose.

4.10    *Transactions of Members with the Company.* Subject to any provisions set forth in this Agreement and the Act and with the prior approval of the Board of Directors, a Member may, but shall not be obligated to, lend money to, and transact other business with, the Company, and such Member shall have the same rights and obligations with respect thereto as a Person who is not a Member. All such activities shall be on arm's length terms and conditions. Except as otherwise set forth in Schedule 3, no Member shall receive preferential treatment from the Company.

4.11    *Material Events.* Upon the consummation of a Material Event (collectively, a "Disposition") any consideration received by the Company in connection with any Disposition (including any equity securities to be issued to its Members in contemplation of an initial public offering) shall be paid as follows: (i) to the Strategic Members in an amount equal to the sum of (x) each Strategic Member's Ownership Interest as set forth on Schedule 3 annexed hereto and (y) each Strategic Member's share of the Profits Pool, which shall be allocated to the Strategic Members in accordance with each Strategic Member's applicable Billing Percentage for the four fiscal quarters completed immediately prior to such Disposition, (ii) five percent (5%) shall be paid to such employees of the Company and in such amounts as shall be determined by the Chief Executive Officer and (iii) 37.50% shall be paid *pro rata* to the Initial Members; provided that should any Strategic Member fail to become a Member, the

1527-001 #38522/v11                                         11

Ownership Interests and the Profits Pool allocable to such Strategic Member shall be retained by the Initial Members and the amount paid pursuant to this Paragraph to the Strategic Members shall be reduced accordingly and the amount paid to the Initial Members shall be increased accordingly.

## *ARTICLE 5*

### *MEETINGS OF MEMBERS*

5.1     *Place of Meeting.* All meetings of the Members shall be held at any place within or without the State of Delaware which may be designated by the Board of Directors. In the absence of such designation, Members' meetings shall be held at the principal executive office of the Company.

5.2     *Meetings of Members.* Meetings of the Members for the purpose of taking any action permitted to be taken by the Members may be called by the Board of Directors, or by Members owning at least 10 Units. Upon request in writing that a meeting of Members be called for any proper purpose, the secretary forthwith shall cause notice to be given to the Members entitled to vote in accordance with Section 20.8 hereof. Except where other express provision is made by statute, written notice of meetings of the Members shall be given to each Member entitled to vote not less than ten (10) nor more than sixty (60) days before the meeting. Such notices shall state:

(a)     the place, date and hour of the meeting; and

(b)     those matters which the person or persons calling the meeting, at the time of the mailing of the notice, intend to present for action by the Members.

5.3     *Quorum.* The presence at any meeting in person or by proxy of Members holding the Requisite Voting Interest entitled to vote at such meeting shall constitute a quorum for the transaction of business.

5.4     *Waiver of Notice.* The actions of any meeting of Members, however called and noticed, and wherever held, shall be as valid as if taken at a meeting duly held after regular call and notice, if a quorum be present either in person or by proxy. The presence or attendance of a Member at a meeting shall constitute a waiver of notice of such meeting, except when the Member objects, at the meeting, to the transaction of any business because the meeting is not lawfully called or convened, and except that attendance at a meeting is not a waiver of any right to object to the consideration of matters required to be included in the notice but not so included, if such objection is expressly made at the meeting.

5.5     *Action by Members Without a Meeting.* Any other action which, under any provision of the Act or the Certificate of Formation or this Agreement, may be taken at a meeting of the Members, may be taken without a meeting, and without notice except as hereinafter set forth, if a consent in writing, setting forth the action so taken, is signed by Members having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all Members entitled to vote thereon were present and voted. All such consents shall be filed with the secretary of the Company and shall be maintained in the Company's records.

Unless the consents of all Members entitled to vote have been solicited in writing, prompt notice shall be given of the taking of any action approved by Members without a meeting by less than

unanimous written consent to those Members entitled to vote who have not consented in writing.

Any Member giving a written consent, or the Member's proxyholders, or a personal representative of the Member or their respective proxyholders, may revoke the consent by a writing received by the secretary prior to the time that written consents of the number of votes required to authorize the proposed action have been filed with the secretary, but may not do so thereafter. Such revocation is effective upon its receipt by the secretary or, if there shall be no person then holding such office, upon its receipt by any other officer or director of the Company.

5.6     *Record Date.* The Board of Directors may fix a time in the future as a record date for the determination of the Members entitled to notice of and to vote at any meeting of Members or entitled to give consent to action by the Company in writing without a meeting, to receive any report, to receive any dividend or distribution, or any allotment of rights, or to exercise rights with respect to any change, conversion or exchange of Interests. The record date so fixed shall be not more than sixty (60) days nor less than ten (10) days prior to the date of any meeting, nor more than sixty (60) days prior to any other event for the purposes of which it is fixed. When a record date is so fixed, only Members of record at the close of business on that date are entitled to notice of and to vote at any such meeting (with such voting power as such Member shall possess on and as of such record date), to give consent without a meeting, to receive any report, to receive a dividend, distribution, or allotment of rights, or to exercise the rights, as the case may be, notwithstanding any transfer of any Interests on the books of the Company after the record date, except as otherwise provided by statute or in the Certificate of Formation or this Agreement.

If the Board of Directors does not so fix a record date:

(a)     the record date for determining Members entitled to notice of or to vote at a meeting of Members shall be at the close of business on the business day immediately preceding the day on which notice is given or, if notice is waived, at the close of business on the business day immediately preceding the day on which the meeting is held (in each case, with such voting power as such member shall possess, on and as of such date); and

(b)     the record date for determining Members entitled to give consent to Company action in writing without a meeting shall be the day on which the first written consent is given.

### ARTICLE 6

### MANAGEMENT OF THE COMPANY

6.1     *Board of Directors.* Subject to the provisions of this Agreement as to action required to be authorized or approved by the Members, the business and affairs of the Company shall be managed and all its powers shall be exercised by or under the direction of a Board of Directors.

Except as otherwise provided in this Agreement or pursuant to the Act, it is hereby expressly declared that the Board of Directors shall have the following powers:

(1)     to conduct, manage and control the business and affairs of the Company and to make such rules and regulations therefor not inconsistent with law or with the Certificate of Formation or with this Agreement, as the Board of Directors shall deem to be in the best interests of the Company;

(2)     to appoint and remove at pleasure the officers, agents and employees of the Company, prescribe their duties and fix their compensation;

(3)     to borrow money and incur indebtedness for the purposes of the Company and to cause to be executed and delivered therefor, in the Company's name, promissory notes, bonds, debentures, deeds of trust, mortgages, pledges, hypothecation's or other evidences of debt and securities therefor;

(4)     except as otherwise specifically provided in Section 8.3, to acquire real and personal property, arrange financing and enter into contracts;

(5)     to authorize on behalf of the Company any amendments, modifications, waivers or other changes to the License Agreement.

6.2     *Limited Liability*. Except as expressly set forth in this Agreement or required by law, no member of the Board of Directors shall be personally liable for any debt, obligation, or liability of the Company, whether arising in contract, tort or otherwise, solely by reason of being a member of the Board of Directors of the Company.

6.3     *Number and Qualifications of Directors*. The authorized number of directors which shall constitute the Board of Directors shall be five (5); provided that so long as the only Members of the Company are the Initial Members, the number of directors comprising the Board of Directors shall be two (2), Caro and Raquet. The authorized number of directors may be changed from time to time as provided in Section 4.6.

6.4     *Election and Removal of Directors.*

(a)     The five (5) directors shall be selected as follows:

(i)     two (2) members shall be elected by the Strategic Members, one (1) of which shall be a member of the Business Committee created pursuant to Section 6.10 hereof and one (1) of which shall be a member of the Technology Committee created pursuant to Section 6.11 hereof, or the two (2) members shall otherwise be determined by the Strategic Members in consultation with the Initial Members, with the Strategic Members voting individually as one class, by a majority of the Voting Interests of the Strategic Members;

(ii)     two (2) members shall be the Initial Members or their designees; and.

(iii)    one (1) independent director will be elected by the Members, by the Requisite Voting Interest.

(b)     Any director may be removed, with or without cause, by the required vote by which such director was elected pursuant to Section 6.4(a).

6.5     *Vacancies; Resignations.*

(a)     A vacancy shall be deemed to exist in case of the death, Bankruptcy, mental

1527-001 #38522/v11                                             14

incompetence, resignation or removal of any director, if the authorized number of directors be increased, or if a class of Members fail, at any meeting of Members at which any director or directors are to be elected, to elect the full authorized number of directors to be voted for at that meeting by such Members.

(b)     A vacancy may only be filled by the required vote by which such director which created the vacancy was elected.

(c)     Any director may resign effective upon thirty (30) days prior written notice to the Members of the Company, unless the notice specifies a later time for the effectiveness of such resignation.

6.6     *Initial Directors.* The names and addresses of the initial Board of Directors, to hold office from and after the date of this Agreement until their respective successors are elected and qualified, are as set forth in Schedule 2.

6.7     *Compensation of Directors.* Each director of the Company shall be entitled to such fees for their services as directors as shall be approved by a Requisite Voting Interest. All usual and reasonable expenses relating to a director's membership on the Company's Board of Directors shall be borne by the Company, including transportation and lodging expenses, if applicable.

6.8     *Directors Engaging in Other Activities.* Each director is not obligated to devote all of his time to the business and affairs of the Company. Each director shall devote whatever time, effort and skill as they deem appropriate for the operation of the Company.

6.9     *Transactions of Directors with the Company.* Subject to any limitations set forth in this Agreement and with the prior approval of a majority of disinterested directors, a director may lend money to and transact other business with the Company. Subject to other applicable law, such director has the same rights and obligations with respect thereto as a Person who is not a Member or a director.

6.10     *Business Committee.* The Company hereby establishes the Business Committee, which shall be chaired by the Chief Executive Officer, and which shall have the following powers:

(1)     to establish guidelines and policies for the business operations of the Company;

(2)     to set standards for accuracy of advertising used on the Company's instant messaging communications system;

(3)     to determine the proper disciplinary action for any firm that violates any policy of the Company, including, without limitation, the standard for advertising accuracy referred to in Paragraph (2) of this Section; and

(4)     to set priorities for any enhancements to be made to the Company's instant messaging system.

Upon the admittance of a Strategic Member, such new Strategic Member, shall select one (1) member of the Business Committee, which person shall be employed by such Strategic Member in the sales and trading execution side of such Strategic Member's business. Any vacancy on the Business

1527-001 #38522/v11                         15

Committee shall be filled by the Member that appointed such member of the Business Committee.

6.11    *Technology Committee.* The Company hereby establishes the Technology Committee, which shall be chaired by the President, and which shall have the following powers:

(1)    to review the technology utilized in operating the Company's instant messaging communications system;

(2)    to develop and implement contingency planning for the Company's instant messaging communications system; and

(3)    to review and implement the Company's policy regarding the confidentiality of data on the Company's instant messaging communication system.

Upon the admittance of a Strategic Member, such new Strategic Member shall select one (1) Member of the Technology Committee, which person shall be employed by such Strategic Member in the information technology side of such Strategic Member's business. Any vacancy on the Technology Committee shall be filled by the Member that appointed such member of the Technology Committee.

6.12    *Management Committee.* The Business Committee and the Technology Committee shall be referred to collectively as the "Management Committees."

## *ARTICLE 7*

## *MEETINGS OF BOARD OF DIRECTORS AND MANAGEMENT COMMITTEES*

7.1    *Place of Meetings.* Meetings of the Board of Directors and the Management Committees shall be held at any place within or without the State of Delaware that has been designated from time to time by the Board of Directors and Management Committees, as the case may be. In the absence of such designation, meetings of the Board of Directors and Management Committees shall be held at the principal executive office of the Company.

7.2    *Calling of Meetings.* Meetings of the Board of Directors for any purpose or purposes may be called at any time by any member of the Board of Directors. Meetings of any Management Committee for any purpose may be called by a majority of the members of such Management Committee or by the Board of Directors. Notice of the time and place of meetings shall be delivered in accordance with Section 20.8. The notice need not specify the purpose of the meeting.

7.3    *Quorum; Participation in Meetings by Conference Telephone Permitted; Vote Required for Action.* Presence of a majority of the authorized number of directors or committee members at a meeting of the Board of Directors and each Management Committee, as the case may be, constitutes a quorum for the transaction of business, except as provided herein. Directors or committee members may participate in a meeting through use of conference telephone or similar communications equipment, so long as all participants participating in such meeting can communicate with and hear one another. Except as otherwise provided herein, every act or decision done or made by a majority of the participants present at a meeting duly held at which a quorum is present shall be regarded as the act of the Board of Directors

or each Management Committee, as the case may be, unless there are only two participants in which case unanimity shall be required. A meeting at which a quorum is initially present may continue to transact business notwithstanding the withdrawal of any participant, provided that any action taken is approved by at least a majority of the required quorum for such meeting. A majority of the participants present, whether or not a quorum is present, may adjourn any meeting to another time and place. If the meeting is adjourned for more than twenty-four (24) hours, notice of any adjournment to another time or place (other than adjournments until the time fixed for the next regular meeting of the Board of Directors or each Management Committee, as the case may be, as to which no notice is required) shall be given prior to the time of the adjourned meeting to the participants who were not present at the time of the adjournment.

7.4     *Waiver of Notice; Consent to Meeting.* Notice of a meeting need not be given to any participant who signs a waiver of notice or a consent to holding the meeting or an approval of the minutes thereof, whether before or after the meeting, or who attends the meeting without protesting, prior thereto or at its commencement, the lack of notice to such participant. All such waivers, consents and approvals shall be filed with the Company's records and made a part of the minutes of the meeting.

7.5     *Action Without a Meeting.* Any action required or permitted to be taken by the Board of Directors or any Management Committee may be taken without a meeting and without notice, if a consent in writing, setting forth the action so taken, is signed by members of the Board of Directors or such Management Committee having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all members of the Board of Directors or such Management Committee entitled to vote thereon were present and voted. Such written consent or consents shall be filed with the minutes of the proceedings of the Board of Directors or each Management Committee, as the case may be. Such action by written consent shall have the same force and effect as a unanimous vote of the Board of Directors or each Management Committee, as the case may be.

## ARTICLE 8

## OFFICERS

8.1     *General.* Subject to the provisions of the Act, the Certificate of Formation and this Agreement, the Board of Directors may determine from time to time to appoint one or more individuals as officers of the Company. Every officer must be at least 18 years of age. An officer need not be a Member of the Company, and any number of offices may be held by the same person. The officers of the Company shall be the Chief Executive Officer, a president, a secretary, and a treasurer, who shall also be the chief financial officer of the Company. The Company may also have, at the discretion of the Board of Directors, one or more vice presidents, one or more assistant secretaries, one or more assistant treasurers, and such other officers as may be designated from time to time by the Board of Directors.

8.2     *Appointment and Removal.* The officers shall be appointed by the Board of Directors. Except as otherwise provided in this Agreement, each officer, including an officer elected to fill a vacancy, shall hold office at the pleasure of the Board of Directors until his or her successor is elected. Except as otherwise provided in this Agreement, any officer may be removed, with or without cause, at any time by the affirmative vote of a majority of the Board of Directors then in office, unless there are

only two directors in which case unanimity shall be required.

8.3 *Chief Executive Officer*. Raquet shall be the initial Chief Executive Officer and shall have general supervision, direction and control of the business and affairs of the Company, including without limitation, the ability to acquire real and personal property, arrange financing and enter into contracts, all as necessary for the proper operations of the Company. The Chief Executive Officer shall have such further powers and shall perform such further duties as may be prescribed from time to time by the Board of Directors. The Chief Executive Officer shall also be the Chairman of the Board of Directors. Raquet and the Company shall enter into an employment agreement upon mutually acceptable terms and conditions.

8.4 *President.* Caro shall be the initial President of the Company and shall, subject to the control of the Board of Directors, together with the Chief Executive Officer, have general supervision, direction and control of the business and affairs of the Company. The President shall preside at all meetings of the Members, shall have all of the powers which are ordinarily inherent in the office of the president of a corporation, and shall have such further powers and shall perform such further duties as may be prescribed from time to time by the Board of Directors. Caro and the Company shall enter into an employment agreement upon mutually acceptable terms and conditions.

8.5 *Vice Presidents.* The Board of Directors may at any time or from time to time appoint one or more Persons as Vice President. In the absence or disability or refusal to act of the president, the vice presidents in order of their rank as fixed by the president, or, if not ranked, the vice president designated by the president, shall perform all of the duties of the president and when so acting shall have all the powers of and be subject to all the restrictions upon the president. The vice presidents shall have such other powers and perform such other duties as from time to time may be prescribed for them, respectively, by the president or by this Agreement or by the Board of Directors.

8.6 *Secretary.* The secretary shall keep or cause to be kept at the principal executive office of the Company, or such other place as the president may order, a book of minutes of all proceedings of the Members, the Board of Directors and each Management Committee, with the time and place of holding, whether regular or special, and if special how authorized, the notice thereof given, the names of those present and the number of votes present or represented at such meetings. The secretary or an assistant secretary, or, if they are absent or unable or refuse to act, any other officer of the Company, shall give or cause to be given notice of all the meetings of the Members required by the Agreement or by law to be given, shall keep the seal of the Company, if any, in safe custody, and shall have such other powers and perform such other duties as may be prescribed from time to time by the Chief Executive Officer or by this Agreement or by the Board of Directors.

8.7 *Assistant Secretaries.* It shall be the duty of the assistant secretaries to assist the secretary in the performance of his or her duties and generally to perform such other duties as may be delegated to them by the president or by this Agreement or by the Board of Directors.

8.8 *Treasurer.* The treasurer shall be the chief financial officer of the Company and shall keep and maintain, or cause to be kept and maintained, adequate and correct books and records of account of the Company. The treasurer shall keep or cause to be kept at the principal executive office of the Company a record of Members showing the names of the Members and their addresses, their Capital Contributions, and their respective Interests from time to time. The treasurer shall receive and deposit all

18

moneys and other valuables belonging to the Company in the name and to the credit of the Company and shall disburse the same only in such manner as the president or the Board of Directors may from time to time determine, shall render to the president or the Board of Directors, whenever requested, an account of all of his or her transactions as treasurer and of the financial condition of the Company, and shall perform such further duties as the president or this Agreement or the Board of Directors may prescribe from time to time.

8.9     *Assistant Treasurers.* It shall be the duty of the assistant treasurers to assist the treasurer in the performance of his or her duties and generally to perform such other duties as may be delegated to them by the president or by this Agreement or by the Board of Directors.

## ARTICLE 9

### CAPITAL CONTRIBUTIONS

9.1     *Capital Contributions.*

(a)     Initial Members.  Each Initial Member has made (or shall make) a Capital Contribution to the Company in cash as set forth in Schedule 1.

(b)     Class A Members and Class B Members.  A Class A Member shall be admitted by executing this Agreement and making (or agreeing to make) the Capital Contribution as specified below:

(i)     the payment in one lump sum of $80,000 to the Company by January 31, 2004;

(ii)     the payment of $120,000, payable in six monthly installments of $20,000 with the first installment payable to the Company by no later than February 1, 2004, and executing and delivering the undertaking set forth in Exhibit 9.1(b)(ii); or

(iii)     by agreeing to make the payment of $180,000, which amount shall be deducted from such Strategic Partner's share of the Net Profits payable to such Strategic Partner when and as such amounts are due such Strategic Partner (which shall be the "default" provision in the event that the member does not (a) tender the payment in (i) above, (b) deliver an executed undertaking as provided in (ii) above) or (c) a Member is admitted after February 1, 2004.

(c)     A Class B Member shall be admitted by signing this Agreement and making (or agreeing to make) one of (i), (ii) or (iii) above; provided that the amount shall be only one-quarter of the amount set forth in the selected option.

(d)     If any entity defined herein as constituting a Class A Member or a Class B Member undertakes to contribute capital in six monthly installments pursuant to Section 9.1(b)(ii) hereof, defaults in making any payment of capital (the "Failed Member"), the Failed Member shall cease to be a Member and the Units allocable to such Failed Member shall be allocated at the direction of the Chief Executive Officer, including to any financial institution even if such financial institution is not listed on Schedule 3 annexed hereto.

1527-001 #38522/v11                    19

(e)     Each Strategic Member shall be entitled to exercise its voting rights upon the exercise of the option under paragraphs (i) or (ii) above or the commitment to make the payment in paragraph (iii) above.

9.2     *Timing of Capital Contributions by Raquet.*  Raquet shall receive his Initial Units in consideration for his commitment through the period ended December 31, 2004, to make a Capital Contribution in an aggregate amount not to exceed $2,000,000, which shall be funded from time-to-time or at such time, if ever, as the Board of Directors shall determine such contribution is necessary for the business operations of the Company for the period ended December 31, 2004, subject to a budget jointly approved by the Board of Directors and Raquet.

9.3     *Withdrawal or Reduction of Capital Contributions.*

(a)     Except as expressly provided in this Agreement, no Member shall have the right to withdraw from the Company all or any part of his or its Capital Contribution prior to the dissolution and winding up of the Company.

(b)     Without limiting the generality of Section 9.3(a), except as otherwise provided herein, no Member shall receive any part of his or its Capital Contribution until:

(i)     all liabilities of the Company, except liabilities to Members on account of their Capital Contributions, have been paid or there remains property of the Company sufficient to pay them;

(ii)     the consents required by Section 4.6 are obtained, unless the return of the Capital Contribution may be rightfully demanded under the Act or other applicable law; or

(iii)     the Certificate of Formation or this Agreement is cancelled or so amended as to permit the withdrawal or reduction of Capital Contributions by Members.

9.4     *No Interest Payable on Capital Contributions.*  No interest shall be payable on or with respect to the Capital Contributions or Capital Accounts of Members, except as provided below.

9.5     *Capital Accounts.*

(a)     A single Capital Account shall be maintained for each Member (regardless of the class of Interests owned by such Member and regardless of the time or manner in which such Interests were acquired) in accordance with the capital accounting rules of Section 704(b) of the Code, and the regulations thereunder (including without limitation Section 1.704-1(b)(2)(iv) of the Income Tax Regulations). In general, under such rules, a Member's Capital Account shall be:

(i)     increased by (A) the amount contributed by the Member to the Company (including the amount of any Company liabilities that are assumed by such Member other than in connection with distribution of Company property), (B) the fair market value of property contributed by the Member to the Company (net of liabilities secured by such contributed

20

property that under Section 752 of the Code the Company is considered to assume or take subject to), and (C) allocations to the Member of Company income and gain (or item thereof), including income and gain exempt from tax; and

(ii)    decreased by (A) the amount distributed to the Member by the Company (including the amount of such Member's individual liabilities that are assumed by the Company other than in connection with contribution of property to the Company), (B) the fair market value of property distributed to the Member by the Company (net of liabilities secured by such distributed property that under Section 752 of the Code such Member is considered to assume or take subject to), (C) allocations to the Member of expenditures of the Company not deductible in computing its taxable income and not properly chargeable to the Capital Account, and (D) allocations to the Member of Company loss and deduction (or item thereof).

(b)    Where Section 704(c) of the Code applies to Company property or where Company property is revalued pursuant to paragraph (b)(2)(iv)(f) of Section 1.704-1 of the Income Tax Regulations, each Member's Capital Account shall be adjusted in accordance with paragraph (b)(2)(iv)(g) of Section 1.704-1 of the Income Tax Regulations as to allocations to the Members of depreciation, depletion, amortization and gain or loss, as computed for book purposes with respect to such property.

(c)    When Company property is distributed in kind (whether in connection with liquidation and dissolution or otherwise), the Capital Accounts of the Members shall first be adjusted to reflect the manner in which the unrealized income, gain, loss and deduction inherent in such property (that has not been reflected in the Capital Account previously) would be allocated among the Members if there were a taxable disposition of such property for the fair market value of such property (taking into account Section 7701(g) of the Code) on the date of distribution.

(d)    The Members shall direct the Company's accountants to make all necessary adjustments in each Member's Capital Account as required by the capital accounting rules of Section 704(b) of the Code and the regulations thereunder.

## ARTICLE 10

### ALLOCATION OF PROFITS AND LOSSES; TAX AND ACCOUNTING MATTERS

10.1    *Allocations.*  Except as otherwise provided in this Article 10, Net Profit and Net Loss of the Company shall be allocated among the Members in accordance with the following provisions.

(a)    *Allocation of Losses.*  All Net Losses shall be allocated among the Members as follows:

(i)    first, Net Losses shall be allocated to the Initial Members, *pro rata* in proportion to the Capital Accounts of the Initial Members (after adjusting such capital accounts to reflect allocations pursuant to Section 10.1(a)(i)), until the Capital Accounts of such Initial Members have been reduced to zero;

(ii) second, to all Class A Members and Class B Members, as the case may be, *pro rata*, in proportion to the Capital Accounts of such Class A Members and Class B Members until the Capital Accounts of all such members have been reduced to zero; and

(iii) third, Net Losses shall be allocated to all Members, *pro rata*, in proportion to their Profits Interests.

(b) *Allocation of Profits.* All Net Profits for any Reference Period (as such term is defined in Paragraph (b)(v) of this Section 10.1) shall be allocated among the Members as follows:

(i) first, to those Members to whom Net Losses were allocated pursuant in Section 10.1(a) for all prior periods, in reverse order, until the cumulative Net Profits allocated pursuant to this Section 10.1(b)(i) are equal to the cumulative losses allocated pursuant to Section 10.1(a) for all prior periods;

(ii) second, during the time the Initial Members are the sole Members, 100% to the Initial Members, 50% to Raquet and 50% to Caro;

(iii) third, from and after the admission of any Strategic Member, to Raquet until the aggregate of all amount of Net Profits allocated to Raquet pursuant to this Section 10.1(b)(iii) is equal to the Capital Contribution made by Raquet to the Company; provided, however, that no amount shall be so allocated to Raquet pursuant to this paragraph unless the Board of Directors has determined that the Company has sufficient funds that would allow such amount allocable to Raquet to be distributed to him pursuant to Section 11.1(a)(2) hereof;

(iv) fourth, from and after the admission of any Strategic Member, as follows:

(1) subject to the provisions of clause (2) of this Paragraph, 42.5% to the Initial Members, 21.25% to each Initial Member;

(2) up to 57.50% to the Strategic Members, with each Strategic Member receiving an allocation in an amount determined by each Strategic Member's (x) Ownership Interest as set forth on Schedule 3 annexed hereto and (y) interest in the Profits Pool as set forth on Schedule 3 annexed hereto, which shall be allocated to each Strategic Member in accordance with each Strategic Member's Billing Percentage for the applicable Reference Period. In the event that the amount allocable collectively to the Strategic Members pursuant to the provisions of this Paragraph (2) shall be less than 57.50%, the difference between (a) 57.50% and (b) the amount allocable collectively to the Strategic Members shall be allocated, *pro rata*, to the Initial Members.

(v) Unless otherwise determined by the Board of Directors, each calendar month shall be the reference period (the "Reference Period") and the allocations of profits and losses shall be made within thirty (30) days of the end of each Reference Period (each such date, the "Monthly Distribution Date"). For purposes of making allocations under this Section 10, a separate Capital Account shall be maintained for each class of interests owned by a Member.

22

(vi)     As used herein, the Billing Percentage means the percent, rounded to the nearest one-tenth of one percent, equal to each Strategic Member's billings to the Company for the applicable Reference Period divided by the total billings to the Company by all Strategic Members, for the applicable Reference Period. Notwithstanding anything contained herein to the contrary, any distribution in respect of a Reference Period to any Strategic Member shall be net of the amount billed by the Company to such Strategic Member during such Reference Period or accumulated billings in prior Reference Periods. Unless otherwise determined by the Board of Directors, net billing offsets shall be made on the Monthly Distribution Date. In no event shall any Strategic Member be billed by the Company for use of the Company's instant messaging system, and all amount owed shall be simply netted from the amount of Net Profits payable to such Strategic Member.

(c)     *Allocations With Respect to Property.* Solely for tax purposes, in determining each Member's allocable share of the taxable income or loss of the Company, depreciation, depletion, amortization and gain or loss with respect to any contributed property, or with respect to revalued property where the Company's property is revalued pursuant to paragraph (b)(2)(iv)(f) of Section 1.704-1 of the Income Tax Regulations, shall be allocated to the Members in the manner (as to revaluations, in the same manner as) provided in Section 704(c) of the Code. The allocation shall take into account, to the full extent required or permitted by the Code, the difference between the adjusted basis of the property to the Member contributing it (or, with respect to property which has been revalued, the adjusted basis of the property to the Company) and the fair market value of the property determined by the Board of Directors at the time of its contribution or revaluation, as the case may be.

(d)     *Minimum Gain Chargeback.* Notwithstanding anything to the contrary in this Section 10.1, if there is a net decrease in Company Minimum Gain or Company Nonrecourse Debt Minimum Gain (as such terms are defined in Sections 1.704-2(b) and 1.704-2(i)(2) of the Income Tax Regulations, but substituting the term "Company" for the term "Partnership" as the context requires) during a Company taxable year, then each Member shall be allocated items of Company income and gain for such year (and, if necessary, for subsequent years) in the manner provided in Section 1.704-2 of the Income Tax Regulations.

This provision is intended to be a "minimum gain chargeback" within the meaning of Sections 1.704-2(f) and 1.704-2(i)(4) of the Income Tax Regulations and shall be interpreted and implemented as therein provided.

(e)     *Qualified Income Offset.* Subject to the provisions of Section 10.1(d), but otherwise notwithstanding anything to the contrary in this Section 10.1, if any Member's Capital Account has a deficit balance, computed in accordance with the rules of paragraph (b)(2)(ii)(d) of Section 1.704-1 of the Income Tax Regulations, then sufficient amounts of income and gain (consisting of a *pro rata* portion of each item of Company income, including gross income, and gain for such year) shall be allocated to such Member in an amount and manner sufficient to eliminate such deficit as quickly as possible.

This provision is intended to be a "qualified income offset" within the meaning of Section 1.704-1(b)(2)(ii)(d) of the Income Tax Regulations and shall be interpreted and implemented as therein provided.

(f) *Depreciation Recapture.* Subject to the provisions of Section 704(c) of the Code and Sections 10.1(c) through (e) hereof, gain recognized (or deemed recognized under the provisions hereof) upon the sale or other disposition of Company property, which is subject to depreciation recapture, shall be allocated to the Member who was entitled to deduct such depreciation.

(g) *Loans.* If and to the extent any Member is deemed to recognize income as a result of any loans pursuant to the rules of Sections 1272, 1273, 1274, 7872 or 482 of the Code, or any similar provision now or hereafter in effect, any corresponding resulting deduction of the Company shall be allocated to the Member who is charged with the income. Subject to the provisions of Section 704(c) of the Code and Sections 10.1(c) through (e) hereof, if and to the extent the Company is deemed to recognize income as a result of any loans pursuant to the rules of sections 1272, 1273, 1274,7872 or 482 of the Code, or any similar provision now or hereafter in effect, such income shall be allocated to the Member who is entitled to any corresponding resulting deduction.

(h) *Tax Credits.* Tax credits shall generally be allocated according to Section 1.704-1(b)(4)(ii) of the Income Tax Regulations or as otherwise provided by law. Investment tax credits with respect to any property shall be allocated to the Members *pro rata* in accordance with the manner in which Company profits are allocated to the Members as of the time such property is placed in service. Recapture of any investment tax credit required by Section 47 of the Code shall be allocated to the Members in the same proportion in which such investment tax credit was allocated.

(i) *Change of Pro Rata Interests.* Except as provided in Sections 10.1(g) and (h) hereof or as otherwise required by law, if the proportionate interests of the Members of the Company are changed during any taxable year or any Reference Period (or any shorter period for which Net Profits and Net Losses may be allocated as determined by the Board of Directors), all items to be allocated to the Members for such entire taxable year shall be prorated on the basis of the portion of such taxable year which precedes each such change and the portion of such taxable year on and after each such change according to the number of days in each such portion, and the items so allocated for each such portion shall be allocated to the Members in the manner in which such items are allocated as provided in Section 10.1(a) and (b) during each such portion of the taxable year in question.

(j) *Effect of Special Allocations on Subsequent Allocations.* Any special allocation of income or gain pursuant to Section 10.1(d) or (e) hereof shall be taken into account in computing subsequent allocations of income and gain pursuant to this Section 10.1 so that the net amount of all such allocations to each Member shall, to the extent possible, be equal to the net amount that would have been allocated to each such Member pursuant to the provisions of this Section 10.1 if such special allocations of income or gain under Section 10.1(d) or (e) hereof had not occurred.

(k) *Nonrecourse and Recourse Debt.* Items of deduction and loss attributable to Member nonrecourse debt within the meaning of Section 1.704-2(b)(4) of the Income Tax Regulations shall be allocated to the Members bearing the economic risk of loss with respect to such debt in accordance with Section 1.704-2(i)(1) of the Income Tax Regulations. Items of deduction and loss attributable to recourse liabilities of the Company, within the meaning of Section 1.752-2 of the Income Tax Regulations, shall be allocated among the Members in accordance with the ratio in which the Members share the economic risk of loss for such liabilities.

1527-001 #38522/v11                                       24

(l) *State and Local Items.* Items of income, gain, loss, deduction, credit and tax preference for state and local income tax purposes shall be allocated to and among the Members in a manner consistent with the allocation of such items for federal income tax purposes in accordance with the foregoing provisions of this Section 10.1.

10.2 *Accounting Matters.* The Board of Directors shall cause to be maintained complete books and records accurately reflecting the accounts, business and transactions of the Company on a calendar-year basis and using such cash, accrual, or hybrid method of accounting as in the judgment of the Board of Directors is most appropriate; provided, however, that books and records with respect to the Company's Capital Accounts and allocations of income, gain, loss, deduction or credit (or item thereof) shall be kept under U.S. federal income tax accounting principles as applied to partnerships.

10.3 *Tax Status and Returns.*

(a) Any provision hereof to the contrary notwithstanding, solely for United States federal income tax purposes, each of the Members hereby recognizes that the Company is subject to the provisions of Subchapter K of Chapter 1 of Subtitle A of the Code; provided, however, the filing of U.S. Partnership Returns of Income shall not be construed to extend the purposes of the Company or expand the obligations or liabilities of the Members.

(b) The Treasurer shall prepare or cause to be prepared all tax returns and statements, if any, that must be filed on behalf of the Company with any taxing authority, and shall make timely filing thereof. Within ninety (90) days after the end of each calendar year, the Treasurer shall prepare or cause to be prepared and delivered to each Member a report setting forth in reasonable detail the information with respect to the Company during such calendar year reasonably required to enable each Member to prepare his or its federal, state and local income tax returns in accordance with applicable law then prevailing.

(c) Unless otherwise provided by the Code or the Income Tax Regulations thereunder, the Treasurer or, if no Treasurer shall have been appointed, such person selected by the Board of Directors shall be deemed to be the "Tax Matters Partner" for U.S. federal income tax purposes.

## ARTICLE 11

### DISTRIBUTIONS

11.1 *Distributions.*

(a) Subject to the reasonably anticipated business needs and opportunities of the Company, taking into account all debts, liabilities and obligations of the Company then due, including the payments referred to in Section 10.1(b), working capital and other amounts which the Board of Directors deems necessary for the Company's business or to place into reserves for customary and usual claims with respect to such business, and subject also to any restrictions under applicable law (including, without limitation, any obligation to withhold and remit any amounts to any governmental authority), the Board of Directors may resolve to distribute cash from operations, investment activities and capital transactions of the Company ("Distributable Cash") to the Members (unless otherwise provided herein). Subject to the foregoing and to the provisions of paragraph (b) of this Section 11.1, Distributable Cash

shall be distributed to the Members as follows:

(1) First, during the time the Initial Members are the sole Members or as otherwise provided herein, 100% to the Initial Members, 50% to Raquet and 50% to Caro.

(2) Second, from and after the admission of any Strategic Member, to Raquet until the aggregate of all amounts distributed to Raquet pursuant to this Section 11.1(a)(2) is equal to the Capital Contributions made by Raquet to the Company; provided, however, that no amount shall be distributed pursuant to this paragraph until the Board of Directors has determined that sufficient funds shall be available to the Company to meet its obligations and its expected funding requirements.

(3) Third, from and after the admission of any Strategic Member, as follows:

    (a) subject to the provisions of clause (b) of this Paragraph, 42.5% to the Initial Members, 21.25% of each Initial Member; and

    (b) up to 57.50% to the Strategic Members, with each Strategic Member receiving a distribution in an amount determined by each Strategic Member's (x) Ownership Interest as set forth on Schedule 3 annexed hereto and (y) interest in the Profits Pool as set forth on Schedule 3 annexed hereto, which shall be allocated to each Strategic Member in accordance with each Strategic Member's Billing Percentage for the applicable Reference Period. In the event that the amount distributable collectively to the Strategic Members pursuant to the provisions of this Paragraph (b) shall be less than 57.50%, the difference between (a) 57.50% and (b) the amount distributable collectively to the Strategic Members shall be distributed, *pro rata*, to the Initial Members.

(4) In the event that the amount otherwise distributable to any Strategic Member shall be applied in payment of such Strategic Member's Capital Contribution as provided for pursuant to Section 9.1(b)(iii) hereof or utilized to offset the billings of such Strategic Member, such distributable amount shall, at the sole discretion of the Chief Executive Officer, either be added to the Reserve Account created pursuant to Section 4.5(f) hereof or distributed in accordance with Paragraph (1) of this Section.

(5) The Company shall distribute any Distributable Cash to its Members on a monthly basis, within thirty (30) days of the end of each month.

(6) Ordering Rules. All Net Profits and Net Losses and all distributions of Distributable Cash to Members shall be credited or charged, as the case may be, to each Member's Capital Account as of the date at which Net Profits and Net Losses are determined and distributions of Distributable Cash shall be made within fifteen business days of any date when Net Profits and Net Losses have been so determined in accordance with the provisions of Section 1.1 (y) of this Agreement.

11.2   *Form of Distributions.*

(a)   Except as otherwise provided herein, (i) no Member, regardless of the nature of the Member's Capital Contribution, has any right to demand and receive any distribution from the Company in any form other than money and (ii) no Member may be compelled to accept from the Company a distribution of any asset in kind.

(b)   Without limiting the generality of Section 11.2(a), the Board of Directors may, with the consent of the Member receiving the distribution and with any other consents required by Section 4.6 distribute specific property or assets of the Company to one or more Members.

11.3   *Billings to Strategic Members.*   The Strategic Members shall not be required to make payments on the billings they incur and to the extent that any such billing exceeds the offsets provided for in the next succeeding sentence, such billing shall be cumulative and shall be used for future offsets. All billings to each Strategic Member shall only be utilized as offsets (i) against any distributions payable to such Strategic Member pursuant to the provisions of Article 11 hereof, (ii) in satisfaction of such Strategic Member's payment obligation to make a Capital Contribution pursuant to the provisions of Section 4.5(d)(iii) hereof which may be utilized, at the discretion of the Chief Executive Officer to fund the Reserve Account established pursuant to Section 4.5(f) hereof, and (iii) in the calculation of such Strategic Member's Billing Percentage to be utilized in the calculation of the Distribution payable to such Strategic Member in the event of an Material Event as set forth in Section 4.11 hereof.

11.4   *Restriction on Distributions.*   No distribution shall be made by the Company if, after giving effect to the distribution:

(a)   The Company would not be able to pay its debts as they become due in the usual course of business; or

(b)   The Company's total assets would be less than the sum of its total liabilities plus, unless this Agreement provides otherwise, the amount that would be needed, if the Company were to be dissolved at the time of the distribution, to satisfy the preferential rights of other Members, if any, upon dissolution that are superior to the rights of the Member receiving the distribution.

11.5   *Return of Distributions.*   Members and Assignees who receive distributions made in violation of the Act or this Agreement shall return such distributions to the Company. Except for those distributions made in violation of the Act or this Agreement, no Member or Assignee shall be obligated to return any distribution to the Company or pay the amount of any distribution for the account of the Company or to any creditor of the Company. The amount of any distribution returned to the Company by a Member or Assignee or paid by a Member or Assignee for the account of the Company or to a creditor of the Company shall be added to the account or accounts from which it was subtracted when it was distributed to the Member or Assignee.

11.6   *Withholding from Distributions.*   To the extent that the Company is required by law to withhold or to make tax or other payments on behalf of or with respect to any Member, the Company may withhold such amounts from any distribution and make such payments as so required. For purposes of this Agreement, any such payments or withholdings shall be treated as a distribution to the Member on

behalf of whom the withholding or payment was made.

11.7 *754 Election.* In the event of a distribution of property to a Member, the death of an individual Member or a transfer of any interest in the Company permitted under the Act or this Agreement, the Company may, in the discretion of the Board of Directors upon the written request of the transferor or transferee, file a timely election under section 754 of the Code and the Income Tax Regulations thereunder to adjust the basis of the Company's assets under section 734(b) or 743(b) of the Code and a corresponding election under the applicable provisions of state and local law, and the person making such request shall pay all costs incurred by the Company in connection therewith, including reasonable attorneys' and accountants' fees.

## *ARTICLE 12*

## *RESTRICTIONS ON TRANSFER OF INTERESTS; ADMISSION OF MEMBERS*

12.1 *Transfer of Interest.*

(a) Except as provided in this Article, no Member may transfer his or its Interest to any Person, including another Member, and no transferee of a Member's Interest may be admitted as a Member, except a Member may transfer his or its Interest in the Company to his or its general partners, limited partners, retired partners, members or stockholders, or the estates, family members, trusts or Affiliates of such persons or entities (each a "Related Transferee"); provided that each Related Transferee signs this Agreement and agrees to be bound by the terms contained herein.

(b) Any transferee of a Member's Interest who fails to comply with subsection (a) of this Section 12.1 shall have no right to vote or otherwise participate in the business and affairs of the Company or to become a Member; provided, however, that if the transferee is already a Member, then such transferee Member shall only be entitled to vote the Interest which he or it held prior to the transfer.

(c) Any transferee of a Member's Interest who fails to comply with subsection (a) of this Section 12.1 shall only be entitled to receive the share of profits or other compensation by way of income and the return of Capital Contributions, if any, to which the transferring Member would otherwise be entitled, but in no circumstances shall such share of profits include participation in the Profits Pool.

(d) Subject to the restrictions set forth in this Section 12.1, certificates evidencing Interests in the Company may be transferred by a written instrument of transfer signed by the transferor and containing the name and address of the transferee, but in the absence of such written instrument of transfer the Board of Directors or officers may accept such evidence of a transfer of Interest as they consider appropriate.

12.2 *Preemptive Rights.* In the event that the Company intends to issue for cash consideration additional Interests of any class (whether directly, or through the exercise of any options, warrants or rights to acquire Interests) (collectively, the "Additional Interests"), the Company shall deliver a notice to the Members (the "Offer Notice") stating (i) the Company's intent to issue such Additional Interests, (ii) the number of such Additional Interests to be offered, (iii) the price and terms, if any, upon which it proposes to issue the Additional Interests and (iv) the identity of the proposed purchasers of the

Additional Interests. Each Member shall have the right to subscribe, *pro rata*, for such Additional Interests at the price and on the terms specified in the Offer Notice, up to that portion of such Additional Interests so as to maintain for each Member its Ownership Interest in the Company. The Members shall receive the Offer Notice at least sixty (60) days prior to the proposed issuance of the Additional Interests. The Members shall have thirty (30) days from the date of such Offer Notice to give written notice to the Company whether they elect to purchase such Additional Interests and the percent of such Additional Interests they elect to purchase, and each Member must pay for such Additional Interests simultaneously with the purchase of the Additional Interests by the third party or parties. In the event that a Member does not elect to purchase the full *pro rata* share of its Additional Interests, the Company shall, as soon as practicable after the expiration of such thirty (30) day period, notify the other Members; who have the option to purchase, *pro rata*, all of the Additional Interests not purchased for a period of five (5) days after the delivery of such notice to purchase such remaining Additional Interests.

12.3    *Offer from Outside Party; Tag Along Rights.*

(a)    In the event that a Strategic Member (hereinafter called the "Selling Member") desires to sell a portion of the Selling Member's Interest (exclusive of its interest in the Profits Pool which shall be forfeited) (the "Offered Interest") and such Selling Member shall have received a bona fide arm's length written offer, which is unconditional and irrevocable (the "Bona Fide Offer"), for the purchase of the Offered Interest from a third party offeree (the "TPO") who is not a Related Transferee (as such term is defined in Section 12.1(a) hereof) of the Selling Member, the Selling Member shall be obligated to comply with the terms set forth in this Section 12.3 in the order set forth below.

(i)    The Selling Member shall first give written notice of the right of first refusal (the "ROFR Notice") to the Company.

(ii)    The ROFR Notice shall state the Selling Member's desire to sell the Offered Interest which notice shall be accompanied by a photocopy of the original executed Bona Fide Offer and shall set forth the name and address of the TPO and the price and material terms of the Bona Fide Offer.

(iii)    Commencing upon receipt of the ROFR Notice, the Company shall have the irrevocable and exclusive option for a period of ten (10) days (the "Company ROFR Exclusivity Period") to elect to purchase all, but not less than all of the Offered Interest by giving written notice of such election (the "Company ROFR Election Notice") to the Selling Member.

(iv)    In the event that the Company gives the Company ROFR Election Notice prior to the expiration of the Company ROFR Exclusivity Period, the Company shall be obligated to purchase and the Selling Member shall be obligated to sell all of the Offered Interest for the purchase price and per the conditions contained in the Bona Fide Offer.

(v)    If the Company fails to give the Company ROFR Election Notice prior to the expiration of the Company ROFR Exclusivity Period, then upon the expiration of the Company ROFR Exclusivity Period, the Selling Member shall give the ROFR Notice to each of the Initial Members (the "Remaining Members").

(vi)    Commencing upon receipt of the ROFR Notice, each Remaining Member shall have the irrevocable and exclusive option for a period of fifteen (15) days (the

"ROFR Exclusivity Period"), to elect to purchase all, but not less than all, of the Offered Interest, by giving written notice of such election (the "ROFR Election Notice") to the Selling Member.

(iv)    In the event a Remaining Member gives the ROFR Election Notice prior to the expiration of the ROFR Exclusivity Period, such Remaining Member shall be obligated to purchase, and the Selling Member shall be obligated to sell, the Offered Interest for the purchase price and upon the conditions contained in the Bona Fide Offer, except that (i) the place of the closing shall be at the offices of the Company and (ii) the cash portion of the purchase price paid by the Remaining Member shall be the lesser of (A) the cash portion of the price set forth in the Bona Fide Offer or (B) 40% of the price set forth in the Bona Fide Offer, and the remaining portion thereof shall be made in equal monthly installment payments over the greater of (C) the term set forth in the Bona Fide Offer or (D) five (5) years. If more than one Remaining Member shall so timely elect, each Remaining Member who so elects shall purchase a pro-rata portion of the Offered Interest based on the proportionate Interest owned (immediately prior to purchasing the Offered Interest) by each such Remaining Member (exclusive of the Offered Interest), or in such other proportion as the Remaining Members shall mutually agree in writing.

(b)    Tag Along Rights. In the event the Remaining Members fail to purchase all of the Offered Interest, each Remaining Member shall have the right for fifteen days from and after the expiration of the ROFR Exclusivity Period (the "T-A Period") to elect to participate in the sale of the Offered Interest on the same terms and conditions as the Selling Member. Each electing Remaining Member (collectively with the Selling Member, the "Participants") may elect to sell all or part of his Interest, but in any event, such Interest shall not exceed the Interest subject to the Bona Fide Offer; provided, however, that in the event the TPO shall provide written notice to the Participants within five (5) days from and after the expiration of the T-A Period (the "Response Period") that he is unwilling to purchase all of the Interests which the Remaining Member(s) elect to sell in addition to the Interest subject to the Bona Fide Offer (the "Tag-Along Interest"), each of the Participants shall only be entitled to sell that portion of the Interest equal to the product of (i) the Interest which the TPO specified in the Bona Fide Offer plus any portion of the Tag-Along Interest which the TPO agrees to purchase and (ii) a fraction, the numerator of which is equal to the Participant's Interest in the Company and the denominator of which is equal to all of the Interests in the Company held by all Participants.

(c)    In event none of the Remaining Members timely elect to purchase the Offered Interest, for a period of thirty days, the Selling Member shall have the right from and after the expiration of five (5) days from and after the ROFR Exclusivity Period to sell, transfer, assign or otherwise convey all, but not less than all, of the Offered Interest to the TPO upon the terms and conditions contained in the Bona Fide Offer. All of the Offered Interest sold by the Selling Member to the TPO hereunder shall be expressly subject to the TPO's written agreement to be bound by all of the provisions of this Agreement.

12.4    *Put Rights of Strategic Members.* Subject to the terms of Section 12.4, each Strategic Member shall have the right to require the Initial Members to repurchase, *pro rata*, all, but not less than all of such Strategic Member's Interest (excluding any interest in the Profits Pool which shall be forfeited) upon providing written notice to the Initial Members (the "Notice"). The purchase price to be paid by the Initial Members for the Strategic Units set forth in a Notice shall be equal to three (3) times the Net Profits of the Company for the most recently completed fiscal year, multiplied by the Interest held by such Strategic Member as of the date of such sale. The repurchase shall be consummated within thirty (30) days of the Company's receipt of the Notice.

12.5 *Payment of Purchase Price.* The purchase price, pursuant to Section 12.4, shall be paid at the option of each of the Initial Members, either in cash or in sixty (60) equal monthly installments, which obligation shall be evidenced by the making and delivery by each such Initial Member, of one (1) promissory note, payable to the order of the former Strategic Member (at such bank or other location as the payee shall designate), in equal amounts over a period of sixty (60) months, commencing one (1) month after the date of the closing (a "Note"). The Note shall be dated the date of the closing, be non-negotiable in form, with interest at the prime rate in effect at Citibank, N.A. from time to time less two (2) percentage points and shall contain a provision (A) for the acceleration of said note in the event of a (x) a default in the payment of said note for a period of ten (10) days after written notice thereof (y) the sale, transfer or other disposition of more than fifty percent (50%) of the Company's Interests, (B) permitting prepayment at any time without penalty and (C) whereby, in the event that an action is commenced for the collection of said Note, the maker shall be liable for all costs of collection (including reasonable attorneys' fees).

12.6 *Admission of New Members.* No Person shall be admitted as a Member except in accordance with the Act and this Agreement. No Person shall be admitted as a Member unless such Person shall have executed this Agreement or shall have agreed in writing to be bound by the terms and conditions of this Agreement.

## ARTICLE 13

### COMARKETING; CONNECTION TO INSTANT MESSAGING SYSTEM

13.1 *Co-Marketing.* Each Class A Member and Class B Member hereby agrees to accept from the Company a list setting forth no less than 40 and no more than 60 buyside firms. Upon a date mutually agreed upon (as between the Company and such Member), each Member hereby agrees to use commercially reasonable efforts to introduce the Company's services to the buyside firms enumerated on such list. Such introduction shall be made in the form of a letter or an e-mail. In addition, each Member hereby agrees that it will consult with the Company in order to determine how best to proceed in marketing the Company's services to the buyside firms enumerated on such list. In no event shall the Company use the name of a Strategic Member, other than as required by law, without the written consent of such Strategic Member.

13.2 *Connection to Instant Messaging System.* Each Strategic Member shall make a good faith effort to connect with the Company's instant messaging system by no later than February 27, 2004. Once connected to the Company's instant messaging system, each Strategic Member hereby agrees to make a good faith effort to remain connected to the Company's messaging system. For purposes of this Agreement, "to connect" with the Company's system shall mean the receipt by the Company of each such Strategic Member's Indications of Interest, Supers and Trade advertisements for equities. In the event that any Strategic Member shall fail to connect to the Company's instant messaging system by February 27, 2004 or shall fail to remain connected after such date and there exists no good faith reason for such failure that is beyond the control of such Strategic Member (the "Breaching Member"), then such Breaching Member shall forfeit 0.2% of its Ownership Interest and for each month during which such failure shall continue and such forfeited Ownership Interest shall be reallocated to the Initial Members, *pro rata.* Upon a Breaching Member forfeiting all of its Ownership Interest, such Breaching Member shall cease to be a Member and the aggregate Profit Interests of the Strategic Members shall be

reduced by the Profit Interest allocated to such Breaching Member as set forth on Schedule 3 annexed hereto, which Profit Interests shall be reallocated to the Initial Members, *pro rata.*

## *ARTICLE 14*

## *ACCOUNTING, RECORDS, REPORTING TO AND BY MEMBERS*

14.1    *Books and Records.* The books and records of the Company shall be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods followed for United States federal income tax purposes. The books and records of the Company shall reflect all the Company's transactions and shall be appropriate and adequate for the Company's business. The Company shall maintain at its principal executive office all of the following:

(a)    a current list of the full name and last known business or residence address of each Member and Assignee set forth in alphabetical order, together with the Capital Contributions, Capital Accounts and Interests of each Member or Assignee;

(b)    a current list of the full name and business or residence address of each Member of the Board of Directors and each Management Committee;

(c)    a copy of the Certificate of Formation and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which the Certificate or any amendments thereto have been executed;

(d)    copies of the Company's U.S. federal, state and local income tax or information returns and reports, if any, and any tax returns or reports filed by or on behalf of the Company in any other jurisdiction, for the six (6) most recent taxable years;

(e)    a copy of this Agreement and any and all amendments thereto together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments thereto have been executed;

(f)    copies of the financial statements of the Company, if any, for the six (6) most recent fiscal years; and

(g)    the Company's books and records as they relate to the internal affairs of the Company for at least the current and the past four (4) fiscal years.

14.2    *Delivery to Members and Inspection.*

(a)    Upon the request of any Member for purposes reasonably related to the interest of that Person as a Member, the Board of Directors shall promptly deliver to the requesting Member, at the expense of the Company, a copy of the information required to be maintained under Sections 14.1(a), 14.1(b) and 14.1(e).

32

(b)     Each Member has the right, upon reasonable request for purposes reasonably related to the interest of the Person as Member, to:

(i)     inspect and copy during normal business hours any of the Company records described in Sections 14.1(a) through 14.1(g); and

(ii)     obtain from the Board of Directors, promptly after their becoming available, a copy of the Company's U.S. federal, state and local income tax or information returns and reports and any tax returns and reports filed in any other jurisdiction for each fiscal year of the Company.

(c)     The Board of Directors shall be responsible for the preparation of financial reports of the Company and for the coordination of financial matters of the Company with the Company's accountants. Within ninety (90) days after the end of each fiscal year and within sixty (60) days of the end of each fiscal quarter, the Board of Directors shall cause each Member to be furnished with a copy of the balance sheet of the Company as of the last day of the applicable period, a statement of income or loss for the Company for such period and a statement of year-to-date results through such period. Annual statements shall also include a statement showing any item of income, gain, deduction, credit or loss allocable for U.S. federal income tax purposes pursuant to the terms of this Agreement. Annual statements shall be reviewed by the Company's accountants.

(d)     Any inspection or copying by a Member under this Section 14.2 may be made by that Person or that Person's agent or attorney.

14.3     *Reports to Strategic Members.* The Company will provide monthly reports to the Strategic Members. Such monthly report shall set forth (i) a schedule of all distributions to each Member, and (ii) the data utilized to calculate the distributions payable to each Member, including gross cash flows, expenses, gross billings, billings to each Strategic Member, the amount of the profits utilized as payment of each Strategic Member's commitment pursuant to Section 9.1(b) hereof, and the total number of messages sent through the Company's instant messaging system by all of the Strategic Members, including a breakdown of the instant messages sent by each Strategic Member.

14.4     *Filings.* The Board of Directors, at Company expense, shall cause the income tax returns for the Company to be prepared and timely filed with the appropriate authorities. The Board of Directors, at Company expense, shall also cause to be prepared and timely filed, with appropriate federal and state regulatory and administrative bodies, amendments to or restatements of, the Certificate of Formation and all reports required to be filed by the Company with those entities under the Act or other then-current applicable laws, rules and regulations. If the Board of Directors fails to execute or file any document required by the Act, after demand, to do so within a reasonable period of time or refuses to do so, any director may prepare, execute and file that document with the Delaware Secretary of State.

14.5     *Bank Accounts.* The Board of Directors shall maintain the funds of the Company in one or more separate bank accounts in the name of the Company, and shall not permit the funds of the Company to be commingled in any fashion with the funds of any other Person.

14.6     *Accounting Decisions and Reliance on Others.* All decisions as to accounting matters, except as otherwise specifically set forth herein, shall be made by the Board of Directors. The Board of

Case 1:10-cv-05893-BSJ -RLE   Document 22-3   Filed 10/18/10   Page 51 of 114

Directors may rely upon the advice of the Company's accountants as to whether such decisions are in accordance with accounting methods followed for U.S. federal income tax purposes.

## ARTICLE 15

### DISSOLUTION AND LIQUIDATION

15.1    *Dissolution.* The Company shall be dissolved and its affairs wound up upon the first to occur of the following:

(a)    at the time specified in the Certificate of Formation, or upon the expiration of the term specified in Section 2.3 of this Agreement; or

(b)    with the approval of Members possessing the Requisite Voting Interest; or

(c)    a final court order or arbitration award; or

(d)    a Dissolution Event occurs with respect to any Member who is also a director of the Company, unless Members possessing the Requisite Voting Interest vote to continue the business of the Company within ninety (90) days of the occurrence of such Dissolution Event.

15.2    *Liquidation.*

(a)    Upon the occurrence of any of the events of dissolution set forth in Section 15.1 of this Agreement, the Company shall cease to engage in any further business, except to the extent necessary to perform existing obligations, and shall wind up its affairs and liquidate its assets. The Board of Directors, or if there be no Board of Directors then in office the Members (by a vote Members possessing the Requisite Voting Interest), shall appoint a liquidating trustee (who may, but need not, be a Member) who shall have sole authority and control over the winding up and liquidation of the Company's business and affairs and shall diligently pursue the winding up and liquidation of the Company in accordance with the Act. As soon as practicable after his or her appointment, the liquidating trustee shall cause to be filed a statement of intent to dissolve as required by Section 18-203 of the Act.

(b)    During the course of liquidation, the Members shall continue to share profits and losses as provided in Section 10.1 of this Agreement, but there shall be no cash distributions to the Members until the Distribution Date (as defined in Section 15.3).

15.3    *Liabilities.* Liquidation shall continue until the Company's affairs are in such condition that there can be a final accounting, showing that all fixed or liquidated obligations and liabilities of the Company are satisfied or can be adequately provided for under this Agreement. The assumption or guarantee in good faith by one or more financially responsible Persons shall be deemed to be an adequate means of providing for such obligations and liabilities. When the liquidating trustee has determined that there can be a final accounting, the liquidating trustee shall establish a date (not to be later than the end of the taxable year of the liquidation, i.e., the time at which the Company ceases to be a going concern as provided in Section 1.704-1(b)(2)(ii)(g) of the Income Tax Regulations, or, if later, ninety (90) days after the date of such liquidation) for the distribution of the proceeds of liquidation of the Company (the

1527-001 #38522/v11                                              34

"Distribution Date"). The net proceeds of liquidation of the Company shall be distributed to the Members as provided in Section 15.5 hereof not later than the Distribution Date.

15.4    *Settling of Accounts.* Subject to Section 18-804 of the Act, upon the dissolution and liquidation of the Company, the proceeds of liquidation shall be applied as follows:

(i)    first, to pay all expenses of liquidation and winding up;

(ii)    second, to pay all debts, obligations and liabilities of the Company, in the order of priority as provided by law, other than debts owing to the Members or on account of Members' Capital Contributions;

(iii)    third, to pay all debts of the Company owing to a Member; and

(iv)    to establish reasonable reserves for any remaining contingent or unforeseen liabilities of the Company not otherwise provided for, which reserves shall be maintained by the liquidating trustee on behalf of the Company in a regular interest-bearing trust account for a reasonable period of time as determined by the liquidating trustee. If any excess funds remain in such reserves at the end of such reasonable time, then such remaining funds shall be distributed by the Company to the Members pursuant to Section 15.5 hereof.

15.5    *Distribution of Proceeds.* Subject to Section 18-804 of the Act, upon final liquidation or Deemed Liquidation (as defined in Section 15.7) of the Company but not later than the Distribution Date, the net proceeds of liquidation shall be distributed in the following order of priority:

(a)    to creditors, including Members who are creditors, to the extent of any unpaid expenses or any outstanding loan or advance;

(b)    to the Members in respect of the costs of winding up the affairs of the Company, discharging the liabilities of the Company, distributing the assets of the Company and dissolving the Company in accordance with this Article 15; and

(c)    to all the Members in the proportion of their respective positive Capital Accounts, as those accounts are determined after all adjustments to such accounts for the taxable year of the Company during which the liquidation occurs as provided by this Agreement including Section 10.1 (as if such amounts were allocated in accordance with such provision) and as are required by Income Tax Regulations Section 1.704-1(b), such adjustments to be made within the time specified in such Income Tax Regulations.

15.6    *Certificate of Cancellation.* Upon dissolution and liquidation of the Company, the liquidating trustee shall cause to be executed and filed with the Secretary of State of the State of Delaware, a certificate of cancellation in accordance with Section 18-203 of the Act.

15.7    *Certain Acquisitions.*

(a)    A liquidation under Section 15.5 shall be deemed to have occurred (a "Deemed Liquidation") if the Company sells, conveys, or otherwise disposes of all or substantially all of its property or business or merges into or consolidates with any other entity (other than a wholly-owned

subsidiary) or effects any other transaction or series of related transactions in which more than fifty percent (50%) of the voting power of the Company is disposed of, provided, that this Section 15.7(a) shall not apply to a merger effected exclusively for the purpose of changing the domicile of the Company or to incorporate the Company. In the case of the incorporation of the Company Section 4.11 shall apply.

(b)      In the event of a Deemed Liquidation as described in Section 15.7(a) above, if the consideration received by the Company is other than cash, its value will be deemed its fair market value. Any securities shall be valued as follows:

(i)      Securities not subject to investment letter or other similar restrictions on free marketability:

(A)      if traded on a securities exchange or The Nasdaq Stock Market, the value shall be deemed to be the average of the closing prices of the securities on such exchange over the thirty-day period ending three (3) days prior to the closing;

(B)      if actively traded over-the-counter, the value shall be deemed to be the average of the closing bid or sale prices (whichever is applicable) over the thirty-day period ending three (3) days prior to the closing; and

(C)      if there is no active public market, the value shall be the fair market value thereof, as determined by the Board of Directors of the Company.

(ii)      The method of valuation of securities subject to investment letter or other restrictions on free marketability (other than restrictions arising solely by virtue of a stockholder's status as an affiliate or former affiliate) shall be to make an appropriate discount from the market value determined as above in Section 15.7(b)(i) to reflect the approximate fair market value thereof, as determined by the Board of Directors of the Company.

(c)      The Company shall give each holder of record of Interests written notice of such impending transaction not later than ten (10) days prior to the Members' meeting called to approve such transaction, or ten (10) days prior to the closing of such transaction, whichever is earlier, and shall also notify such holders in writing of the final approval of such transaction. The first of such notices shall describe the material terms and conditions of the impending transaction and the provisions of this Section 15.7, and the Company shall thereafter give such holders prompt notice of any material changes. The transaction shall in no event take place sooner than ten (10) days after the Company has given the first notice provided for herein or sooner than ten (10) days after the Company has given notice of any material changes provided for herein; provided, however, that such periods may be shortened upon the written consent of a Requisite Voting Interest.

(d)      In the event the requirements of this Section 15.7 are not complied with, the Company shall forthwith either cause the closing of the transaction to be postponed until such requirements have been complied with, or cancel such transaction, in which event the rights, preferences and privileges of the holders of the Interests shall revert to and be the same as such rights, preferences and privileges existing immediately prior to the date of the first notice referred to in Section 15.7(c) hereof.

## ARTICLE 16

### INDEMNIFICATION AND INSURANCE

16.1 *Indemnification: Proceeding Other Than by Company.* The Company shall indemnify any Person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, except an action by or in the right of the Company, by reason of the fact that he or she is or was a Member, director, officer, employee or agent of the Company, or is or was serving at the request of the Company as a manager, member, director, officer, employee or agent of any other Person, joint venture or other enterprise, against expenses, including attorneys' fees, judgments, fines and amounts paid in settlement actually and reasonably incurred by him or her in connection with the action, suit or proceeding if he or she acted in good faith and in a manner which he or she reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his or her conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, does not, of itself, create a presumption that the person did not act in good faith and in a manner which he or she reasonably believed to be in or not opposed to the best interests of the Company, and that, with respect to any criminal action or proceeding, he or she had reasonable cause to believe that his or her conduct was unlawful.

16.2 *Indemnification: Proceeding by Company.* The Company may indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action or suit by or in the right of the Company to procure a judgment in its favor by reason of the fact that he or she is or was a Member, director, officer, employee or agent of the Company, or is or was serving at the request of the Company as a committee member, director, officer, employee or agent of any other Person, joint venture or other enterprise against expenses, including amounts paid in settlement and attorneys' fees actually and reasonably incurred by him or her in connection with the defense or settlement of the action or suit if he or she acted in good faith and in a manner which he or she reasonably believed to be in or not opposed to the best interests of the Company. Indemnification may not be made for any claim, issue or matter as to which such a Person has been adjudged by a court of competent jurisdiction, after exhaustion of all appeals therefrom, to be liable to the Company or for amounts paid in settlement to the Company, unless and only to the extent that the court in which the action or suit was brought or other court of competent jurisdiction determines upon application that in view of all the circumstances of the case, the person is fairly and reasonably entitled to indemnity for such expenses as the court deems proper.

16.3 *Mandatory Indemnification.* To the extent that a Member, director, officer, employee or agent of the Company has been successful on the merits or otherwise in defense of any action, suit or proceeding described in Sections 16.1 and 16.2, or in defense of any claim, issue or matter therein, he or she must be indemnified by the Company against expenses, including attorneys' fees, actually and reasonably incurred by him or her in connection with the defense.

16.4 *Authorization of Indemnification.* Any indemnification under Section 16.2, unless ordered by a court or advanced pursuant to Section 16.5, may be made by the Company only as authorized in the specific case upon a determination that indemnification of the Member, directors, officer, employee or agent is proper in the circumstances. The determination must be made:

(a)     by a Requisite Voting Interest, excluding any Member seeking indemnification;
or

(b)     if a quorum of Members who were not parties to the action, suit or proceeding cannot be obtained, by independent legal counsel in a written opinion.

16.5    *Mandatory Advancement of Expenses.* The expenses of Members, directors and officers incurred in defending a civil or criminal action, suit or proceeding must be paid by the Company as they are incurred and in advance of the final disposition of the action, suit or proceeding, upon receipt of an undertaking by or on behalf of the Member, director or officer to repay the amount if it is ultimately determined by a court of competent jurisdiction that he or she is not entitled to be indemnified by the Company. The provisions of this Section do not affect any rights to advancement of expenses to which personnel of the Company other than Members, director or officers may be entitled under any contract or otherwise.

16.6    *Effect and Continuation.* The indemnification and advancement of expenses authorized in or ordered by a court pursuant to Section 16.1 to Section 16.5, inclusive:

(a)     does not exclude any other rights to which a person seeking indemnification or advancement of expenses may be entitled under the Certificate of Formation or any limited liability company agreement, vote of Members, if any, or otherwise, for either an action in his or her official capacity or an action in another capacity while holding his or her office, except that indemnification, unless ordered by a court pursuant to Section 16.2 or for the advancement of expenses made pursuant to Section 16.5, may not be made to or on behalf of any Member, director or officer if a final adjudication establishes that his or her acts or omissions involved intentional misconduct, fraud or a knowing violation of the law and was material to the cause of action; and

(b)     continues for a Person who has ceased to be a Member, director, officer, employee or agent and inures to the benefit of his or her heirs, executors and administrators.

16.7    *Insurance and Other Financial Arrangements.*

(a)     The Company may purchase and maintain insurance or make other financial arrangements on behalf of any person who is or was a Member, director, officer, employee or agent of the Company, or is or was serving at the request of the Company as a member, director, officer, employee or agent of any other Person, joint venture or other enterprise for any liability asserted against him or her and liability and expenses incurred by him or her in his or her capacity as a manager, member, director, officer, employee or agent, or arising out of his or her status as such, whether or not the Company has the authority to indemnify him or her against such liability and expenses.

(b)     The other financial arrangements made by the Company pursuant to subsection (a) of this Section 16.7 may include:

(i)     the creation of a trust fund;

(ii)    the establishment of a program of self-insurance;

(iii)    the securing of its obligation of indemnification by granting a security interest or other lien on any assets of the Company; or

          (iv)    the establishment of a letter of credit, guaranty or surety.

(c)    In the absence of fraud:

          (i)    the decision of the Company as to the propriety of the terms and conditions of any insurance or other financial arrangement made pursuant to subsections (a) and (b) of this Section 16.7 and the choice of the person to provide the insurance or other financial arrangement is conclusive; and

          (ii)    the insurance or other financial arrangement:

               (1)    is not void or voidable; and

               (2)    does not subject any Member or director approving it to personal liability for his or her action,

even if a Member or director approving the insurance or other financial arrangement is a beneficiary of the insurance or other financial arrangement.

16.8    *Notice of Indemnification and Advancement.* Any indemnification of, or advancement of expenses to, a Member, director or officer in accordance with this Article, if arising out of a proceeding by or on behalf of the Company, shall be reported in writing to the Members with or before the notice of the next Members' meeting.

16.9    *Repeal or Modification.* Any repeal or modification of this Article by the Members shall not adversely affect any right of a Member, director or officer of the Company existing hereunder at the time of such repeal or modification.

## ARTICLE 17

### SEAL

17.1    *Seal.* The Board of Directors may adopt a seal of the Company in such form as the Board of Directors shall decide.

## ARTICLE 18

### INVESTMENT REPRESENTATIONS; PRIVATE OFFERING EXEMPTION

Each Strategic Member, by his or its execution of this Agreement, hereby represents and warrants to, and agrees with the other Members and the Company as follows:

          39

18.1 *Investment Representations.*

(a) The Strategic Member is acquiring the Units for investment for such Strategic Member's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof and that such Strategic Member has no present intention of selling, granting any participation in, or otherwise distributing same to any person or entity;

(b) The Strategic Member does not have any contract, undertaking, agreement or arrangement with any person or entity to sell, transfer or grant participation to such person or to any third person, with respect to any of the Units,

(c) The Strategic Member has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of the Units, and the business, properties, prospects and financial condition of the Company;

(d) The Strategic Member is a seasoned investor in securities of companies of all types including in the development stage and acknowledges that it is able to fend for itself, can bear the economic risk of its investment, and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the investment in the Units. If other than an individual, such Strategic Member also represents it has not been organized for the purpose of acquiring the Units. The Strategic Member has carefully considered the potential risks relating to the Company and a purchase of the Units, and fully understands that the Units are speculative investments which involve a high degree of risk of loss of such Strategic Member's entire investment;

(e) The Strategic Member is a "qualified institutional buyer" within the meaning of SEC Rule 144A, or an "accredited investor" within the meaning of Regulation D as presently in effect; and

(f) The Strategic Member understands that the Strategic Units are characterized as "restricted securities" under the federal securities laws inasmuch as they are being acquired from the Company in a transaction not involving a public offering and that under such laws and applicable regulations such securities may be resold without registration under the Act only in certain limited circumstances. Without in any way limiting the representations set forth above, the Strategic Member further acknowledges that Article 12 further restricts and prohibits transfers of the underlying Units.

18.2 *No Advertising.* Such Strategic Member has not seen, received, been presented with or been solicited by any leaflet, public promotional meeting, newspaper or magazine article or advertisement, radio or television advertisement, or any other form of advertising or general solicitation with respect to the offer or sale of Interests in the Company.

18.3 *No Registration of Units.* Such Strategic Member acknowledges that the Interests have not been registered under the Securities Act of 1933, as amended (the "Securities Act"), or qualified under any state securities law or under the laws of any other jurisdiction, in reliance, in part, on such Member's representations, warranties and agreements herein.

18.4 *No Obligation to Register.* Such Strategic Member represents, warrants and agrees that the Company and the Board of Directors are under no obligation to register or qualify the Units under the Securities Act or under any state securities law or under the laws of any other jurisdiction, or to assist such Member in complying with any exemption from registration and qualification.

## ARTICLE 19

### DEFAULTS AND REMEDIES

19.1    *Defaults*. If a Member materially defaults in the performance of his or its obligations under this Agreement, and such default is not cured with ten (10) days after written notice of such default is given by the Board of Directors to the defaulting Member for a default that can be cured by the payment of money, or within thirty (30) days after written notice of such default is given by the Board of Directors to the defaulting Member for any other default, then the non-defaulting Members shall have the rights and remedies described in Section 19.2 hereunder in respect of the default.

19.2    *Remedies*. If a Member fails to perform his or its obligations under this Agreement, the Company and the other Members shall have the right, in addition to all other rights and remedies provided herein, on behalf of himself or itself, the Company or the Members, to bring the matter to arbitration pursuant to Section 20.7. The award of the arbitrator in such a proceeding may include an order for specific performance by the defaulting Member of his or its obligations under this Agreement, or an award for damages for payment of sums due to the Company or to a Member.

## ARTICLE 20

### MISCELLANEOUS

20.1    *Entire Agreement*. This Agreement, the schedules hereto and the Transaction Documents constitute the entire agreement among the Members with respect to the subject matter hereof, and supersede all prior and contemporaneous agreements, representations, and understandings of the parties. No party hereto shall be liable or bound to the other in any manner by any warranties, representations or covenants with respect to the subject matter hereof except as specifically set forth herein.

20.2    *Amendments*.

(a)    This Agreement may be amended only in accordance with Section 4.6, except clerical or ministerial amendments, which may be approved by at least four of the five directors of the Board of Directors. All amendments shall be in writing duly executed by all the Members, except in the case of clerical or administrative amendments, which may be executed by at least four of the five directors of the Board of Directors.

(b)    The Certificate of Formation may only be amended in accordance with Section 4.6. Any such amendment shall be in writing, and shall be executed and filed in accordance with Section 18-202 of the Act.

20.3    *No Waiver*. No consent or waiver, express or implied, by the Company or a Member to or of any breach or default by any Member in the performance by such Member of his or its obligations under this Agreement shall constitute a consent to or waiver of any similar breach or default by that or any other Member. Failure by the Company or a Member to complain of any act or omission to act by any Member, or to declare such Member in default, irrespective of how long such failure continues, shall not constitute a waiver by the Company or such Member of his or its rights under this Agreement.

41

20.4    *Third Parties.* Nothing in this Agreement, express or implied, is intended to confer upon any party, other than the parties hereto, and their respective successors and permitted assigns, any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided herein.

20.5    *Severability.* If one or more provisions of this Agreement are held by a proper court to be unenforceable under applicable law, portions of such provisions, or such provisions in their entirety, to the extent necessary and permitted by law, shall be severed herefrom, and the balance of this Agreement shall be enforceable in accordance with its terms.

20.6    *Governing Law.* This Agreement shall be governed by and construed under the substantive laws of the State of Delaware, without regard to Delaware choice of law principles.

20.7    *Arbitration.* Any dispute arising out of or in connection with this Agreement, including any question regarding its existence, validity or termination, shall be settled by arbitration under the Rules of the American Arbitration Association for Commercial Disputes (the "Rules") (as modified by this Section 20.7). The number of arbitrators shall be one (1) if all parties to the dispute agree on the arbitrator. If there is a disagreement on selection of a sole arbitrator, the number of arbitrators then shall be three (3), with the arbitrators to be appointed in accordance with the Rules from a panel of arbitrators in the County of Kent, Delaware. Absent agreement to the contrary, the place of arbitration shall be the County of Kent, Delaware. The arbitration proceedings shall be conducted in the English language, and the arbitral award shall be rendered in writing in the English language and shall state the reasons for the award. Judgment upon the award rendered by the arbitrator or arbitrators may be entered in any court having jurisdiction thereof, and shall be binding and final on the parties hereto. The costs of arbitration, including reasonable legal fees and costs, shall be borne by either or both of the parties in whatever proportion as the arbitrator or arbitrators may award.

20.8    *Notices.* Unless otherwise provided in this Agreement, any notice or other communication herein required or permitted to be given shall be in writing and shall be given by electronic communication, hand delivery, registered or certified mail, with proper postage prepaid, return receipt requested, or courier service regularly providing proof of delivery, addressed to the party hereto as provided as follows:

(i)     all communications intended for the Company shall be sent to its principal executive office to the attention of the president (with a copy to the secretary); and

(ii)    all communications intended for a Member shall be sent to the address of such Member set forth in Schedule 1 to this Agreement, or such other address as such Member shall have provided for such purpose.

All notices shall be sent as aforesaid or at any other address of which any of the foregoing shall have notified the others in any manner prescribed in this Section 20.8.

For all purposes of this Agreement, a notice or communication will be deemed effective:

(a)     if delivered by hand or sent by a recognized international courier, on the day it is delivered unless that day is not a day upon which commercial banks are open for business in the city

specified (a "Local Business Day") in the address for notice provided by the recipient, or if delivered after the close of business on a Local Business Day, then on the next succeeding Local Business Day;

(b) if sent by facsimile transmission, on the date transmitted, provided oral or written confirmation of receipt is obtained by the sender, unless the transmission and confirmation date is not a Local Business Day, in which case on the next succeeding Local Business Day; and

(c) if sent by registered or certified mail, on the tenth Local Business Day after the date of mailing.

20.9 *Titles and Subtitles.* The titles of the sections and paragraphs of this Agreement are for convenience only and are not to be considered in construing this Agreement.

20.10 *Currency.* Unless otherwise specified, all currency amounts in this Agreement refer to the lawful currency of the United States of America.

20.11 *Counterparts.* This Agreement may be executed in one or more original or facsimile counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, and shall become effective when there exist copies hereof which, when taken together, bear the authorized signatures of each of the parties hereto. Only one such counterpart signed by the party against whom enforceability is sought needs to be produced to evidence the existence of this Agreement.

**[Signature page on the next page.]**

*IN WITNESS WHEREOF*, INDII.COM USE, LLC and each of its Members hereby execute this Limited Liability Company Agreement as of the date first written above.

INDII.COM USE, LLC
a Delaware limited liability company

By: _____

Name:  Walter Raquet
Title:   Chief Executive Officer

INITIAL MEMBERS

WALTER RAQUET

MARSHALL CARO

CLASS A MEMBERS

By:_____
    Name:
    Title:


By:_____
    Name:
    Title:


By:_____
    Name:
    Title:

CLASS B MEMBERS

By:_____

Name:

Title:

By:_____

Name:

Title:

By:_____

Name:

Title:

*SCHEDULE 1*

Members of Indii.com USE, LLC

| Name and Address: Initial Members | Capital Contribution | Units | Profits Interest | Ownership Interest |
|---|---|---|---|---|
| Walter Raquet<br>215 Via Del Mar<br>Palm Beach, Florida 33830 | Up to $2 million in accordance with this Agreement | 50 | 50.0% | 50.0% |
| Marshall Caro<br>47 Angelus Drive<br>Greenwich, Connecticut 06831 | $100 | 50 | 50.0% | 50.0% |

**Class A Members**

[Add]

**Class B Members**

[Add]

As of the date of this Limited Liability Company Agreement, the only members of the Company are Initial Members.

1527-001 #38522/v11

*SCHEDULE 2*

## BOARD OF DIRECTORS

Walter Raquet
215 Via Del Mar
Palm Beach, Florida 33830

Marshall Caro
47 Angelus Drive
Greenwich, Connecticut 06831

Exhibit 9.1(b)(ii)

Class A Member Undertaking

In connection with the execution of the Limited Liability Company Agreement of Indii.com USE, LLC (the "Company"), _____ hereby irrevocably agrees and
[name of institution]
undertakes to contribute to the Company capital in an aggregate amount of $120,000 payable in six monthly installments of $20,000, on the first day of each month beginning February 1, 2004.

Name of Institution: _____

By: _____

Name:
Title:

Exhibit 9.1(b)(ii)

Class B Member Undertaking

In connection with the execution of the Limited Liability Company Agreement of Indii.com USE, LLC (the "Company"), _____ hereby irrevocably agrees and
[name of institution]
undertakes to contribute to the Company capital in an aggregate amount of $30,000 payable in six monthly installments of $5,000, on the first day of each month beginning February 1, 2004.

Name of Institution: _____

By:_____
Name:
Title:

Exhibit A

License Agreement

Exhibit B

Service Agreement

Schedule 3

| Strategic Member | Ownership Interest | | Profits Interest |
| --- | --- | --- | --- |
| Bank of America | 2.0% | | 2.0% |
| Bear Stearns | 2.0% | | 2.0% |
| Citibank | 2.0% | | 3.0% |
| Credit Suisse First Boston | 2.0% | | 2.0% |
| Deutsche Bank | 2.0% | | 1.0% |
| Goldman Sachs | 2.0% | | 3.0% |
| J.P. Morgan | 2.0% | | 2.0% |
| Knight | 2.0% | | 2.0% |
| Lehman Brothers | 2.0% | | 2.5% |
| Merrill Lynch | 2.0% | | 3.0% |
| Morgan Stanley | 2.0% | | 3.0% |
| Prudential | 2.0% | | 2.0% |
| RBC | 0.5% | | 1.0% |
| UBS | 2.0% | | 2.5% |
| | 26.5% | Profits Pool | 31.0% |

# EXHIBIT B

COPY

SUPREME COURT OF THE STATE OF NEW YORK ~~~~ HERFORD-NORWAY
COUNTY OF NEW YORK                         ~~~~ICIAL DISTRICT

                                        ZUI NOV 18  P 9:55

BILL ROTHFARB,

                              Plaintiff,                 :  INDEX NO.:  19178/87

          — against —                                   :  IA PART 9 (MOSKOWITZ, J.)

PROGRAMIT, INC., et al.,                                 :  JUDGMENT AND ORDER

                              Defendants.                :

This action was duly tried to the Court without a jury on December 13 and 14, 1990, January 11, and July 10, 12 and 15, 1991. Plaintiff appeared on the first three trial days by Lloyd I. Isler, Esq., and on the other trial days by Stecher Jaglom & Prutzman. Defendants appeared by Fryer Ross & Gowan. The parties submitted post-trial memoranda, reply memoranda and proposed findings of fact and conclusions of law.

On May 3, 1993, the Court issued a written decision finding that plaintiff was entitled to recover:

          a.  commissions from defendants Programit, Inc., Marshall Caro, Protectit Technology, Associated Imperatives, Ltd., and P.I. Systems, Ltd., jointly and severally,

          b.  a two percent equity interest in each of defendants Programit, Inc., Protectit Technology, Associated Imperatives, Ltd., and P.I. Systems, Ltd., and

          c.  attorneys fees in an amount to be determined.

The court directed that a judgment be settled and that it (i) include detailed, readable and clear accounting statements with itemizations for the accounts concerned, with the invoices to calculate the commissions, based upon the evidence at trial, (ii) provide for the issuance of stock to plaintiff in conformity with the Court's decision, and (iii) provide for a severance of the plaintiff's claim for attorneys' fees and a special referee's hearing as to amount;

And the parties having consulted and determined that the amount of commissions due based upon the Court's decision is $120,949.69, as shown on the spreadsheet attached to this Judgment as Exhibit 1;

And pre-judgment interest on such commissions from the date due through July 27, 1993 being $64,936.03, as shown on the spreadsheet attached to this Judgment as Exhibit 1, plus $29.8232 per day for each day after July 27, 1993;

*Now*, on motion of Stecher Jaglom & Prutzman, attorneys for plaintiff, it is

*Ordered, Adjudged and Decreed* that plaintiff Bill Rothfarb, 57 Center Court, Roslyn Heights, New York 11577, recover of defendants Programit, Inc., Marshall Caro, Protectit Technology, Associated Imperatives, Ltd., and P.L. Systems, Ltd., all, residing at 20 Knoll Street, Riverside, Connecticut 06028, jointly and severally, the sum of $120,949.69, plus pre-judgment interest on such amount through July 27, 1993 of $64,936.03, plus pre-judgment interest on such amount for each day after July 27, 1993 at the daily rate of $29.8232 for a total of $78,132.57 after July 27, 1993, plus costs and disbursements as taxed by the Clerk in the amount of $ —0— making in all the sum of $204,018.23 ; and that plaintiff shall have execution therefor; and it is further

*Ordered, Adjudged and Decreed* that defendants Programit, Inc., Protectit Technology, Associated Imperatives, Ltd., and P.L. Systems, Ltd., each issue to Bill Rothfarb sufficient documentation to evidence a 20% equity interest in each of such entities as of July 31, 1985. Such equity shall have full voting rights, transfer rights, and the right to be included, pro-rata, in any registrations, offerings, or sales; and it is further

*Ordered, Adjudged and Decreed* that the amount of plaintiff's entitlement to attorneys' fees and the amount of plaintiff's entitlement arising from his 20% equity interest in defendants Programit, Inc., Protectit Technology, Associated Imperatives, Ltd., and P.L. Systems, Ltd., is severed and referred to a special referee to hear and report as to the amount due; and it is further *Ordered* that plaintiff serve a copy of this order on _____ by _____ of _____

*Ordered, Adjudged and Decreed* that all other claims and counterclaims asserted in this action are dismissed with prejudice; and it is further

*Ordered, Adjudged and Decreed* that the Clerk is directed to enter judgment in accordance with the above.

Judgment signed this _____
19 day of _____ 1993 _____

E N T E R:

Honorable Karla Moskowitz, J.S.C.

_____
Norman Goodman
Clerk

ORDERED, ADJUDGED
AND DECREED that if defendants
Programit, Inc. Protectit Technology Associated
Imperatives, Ltd. and P.L. Systems, Ltd.
any of them, do not have sufficient
issued capital stock available
reissuance to plaintiff, defendant
or shall Caro shall transfer to plaintiff
own capital stock held and owned by
in in each of said companies, such
number of shares as will constitute

equity interest in each of
such entities and any successor
entities and it is further

J.S.C.

**Exhibit 1**

**Resolution of Programit Claim**

07/27/93    11:57 AM

| FILE project | CLIENT NAME | INVOICE | TOTAL AMOUNT | STANDARD SOFTWARE | CUSTOM | HARD-WARE | OTHER | HARDWARE COST | FILL COMM | PAID COMM | % | TIME | ADJ | AMOUNT OWED | COLLECT DATE | INTEREST | TOTAL OWED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ASC | Ali02 | | 9,428.00 | 2,400.00 | 1,000.00 | 5,026.00 | | 412.50 | 787.33 | 667.33 | 100% | 50% | | 60.00 | 11/1/86 | 36.15 | 96.15 |
| ASC | Alli06 | | 3,528.00 | 4,800.00 | | 5,026.00 | | 4,161.50 | 1,286.45 | | 100% | 50% | | 643.23 | 05/28/81 | 359.21 | 1,002.43 |
| ASC | Alli04 | | 3,400.00 | 2,400.00 | | | | | 700.00 | | 100% | 50% | | 350.00 | 04/16/81 | 197.81 | 547.81 |
| ASC | Alli16 | | 750.00 | | 1,000.00 | | | | 75.00 | | 100% | 50% | | 37.50 | 07/17/87 | 21.20 | 58.70 |
| ASC | Alli80 | | 5,094.00 | 750.00 | 750.00 | 5,326.00 | 478.40 | 122.10 | | 25% | 12.5% | | 15.27 | 07/17/87 | 8.29 | 23.56 |
| ASC | Alli81 | | | 4,800.00 | | 5,326.00 | 478.40 | 1,200.00 | | 25% | 12.5% | | 150.00 | 07/11/87 | 81.44 | 231.44 |
| Bierbaum | Alli14 | | 14,118.00 | 6,000.00 | 2,500.00 | 5,190.00 | 3,898.50 | 1,379.75 | 2,264.75 | 100% | 100% | | 1375.00 | 07/04/86 | 1233.26 | 613.26 |
| Bierbaum | Alli13 | | 9,250.00 | 6,000.00 | 3,250.00 | | | 1,500.00 | 1,500.00 | 100% | 100% | | 365.00 | 09/12/86 | 200.68 | 525.68 |
| Bierbaum | Alli42 | | 1,512.56 | | | 1,435.00 | 117.56 | 56.33 | 31.10 | 100% | 100% | | 25.23 | 09/12/86 | 15.50 | 40.62 |
| Bierbaum | Alli04 | | 8,750.00 | | | | 861.70 | 1,875.00 | 1,875.00 | 100% | 100% | | 0.00 | 01/26/87 | 0.00 | 0.00 |
| Bierbaum | Alli82 | | 18,750.00 | 18,750.00 | | | | 1,875.00 | | 100% | 100% | | 1,875.00 | 07/21/87 | 1,014.73 | 2,889.73 |
| Bierbaum | Fli026 | | 5,900.00 | 5,900.00 | | | | 690.00 | | 100% | 25% | 12.5% | | 73.75 | 08/11/87 | 38.90 | 112.72 |
| Bierbaum | Fli046 | | 1,300.00 | 1,300.00 | | | | 130.00 | | 25% | 25% | | 141.25 | 03/22/88 | 67.88 | 209.11 |
| Bierbaum | Fli093R | | 4,059.97 | 3,767.50 | | | 312.47 | 378.75 | | 25% | 50% | | 189.38 | 02/22/88 | 84.56 | 273.94 |
| Cowen | PLi014 | | 14,484.73 | | | 13,330.00 | 9,949.10 | 358.00 | | 0.00% | 25% | | 0.00 | 12/01/87 | 0.00 | 0.00 |
| Cowen | PK015 | | 6,600.00 | 6,600.00 | | | | 350.00 | | 0.00% | 25% | | 0.00 | 12/01/87 | 0.00 | 0.00 |
| Jewell | Fli0521 | | 8,250.00 | 8,000.00 | 250.00 | 1,606.00 | | 2,025.00 | 1,515.83 | 100% | 0% | | 0.00 | 11/02/86 | 0.00 | 0.00 |
| Drexel | Alli035 | | 1,582.50 | 250.00 | 250.00 | | 82.50 | 123.80 | | 0% | 100% | | 123.50 | 11/02/86 | 66.41 | 189.91 |
| Drexel | Alli050 | | 16,700.00 | | | | 640.00 | 3,340.00 | 3,340.00 | 100% | 0% | | 0.00 | 09/26/86 | 0.00 | 0.00 |
| Drexel | Alli123 | | 22,831.35 | 18,700.00 | | 16,380.00 | 1,339.00 | 1,176.00 | 0.00 | 100% | 0% | | 1,461.60 | 04/06/87 | 824.86 | 2,276.46 |
| Edwards | fli029 001 | | 7,000.00 | 6,500.00 | | 500.00 | 340.00 | 1,841.00 | 1,516.76 | 100% | 0% | | 0.00 | 07/01/85 | 0.00 | 0.00 |
| Edwards | fli029 2 | | 2,500.00 | 2,500.00 | | 500.00 | 300.00 | 75.00 | 512.50 | 100% | 0% | | 0.00 | 07/01/85 | 0.00 | 0.00 |
| Edwards | Alli276 | | 6,515.00 | 6,000.00 | | 500.00 | 15.00 | 1,130.00 | 0.00 | 100% | 25% | | 0.00 | 03/22/88 | 0.00 | 0.00 |
| EAB | fli02 | | 4,500.00 | 4,500.00 | | 250.00 | | 358.00 | | 0.00 | 5% | | 0.00 | 01/01/86 | 0.00 | 0.00 |
| EAB | fli182 | | 55,831.67 | 55,831.67 | 250.00 | | | 13,912.92 | 1,125.00 | 100% | 50% | | 8,968.46 | 07/22/87 | 3,777.90 | 10,764.60 |
| EAB | fli022 | | 5,062.50 | | | | | 536.25 | 0.00 | 100% | 25% | | 63.50 | 12/06/87 | 33.77 | 0.00 |
| EAB | fli023 | | 55,000.00 | 55,000.00 | 5,382.50 | | | 13,750.00 | 1,515.83 | 100% | 50% | | 6,875.00 | 10/06/87 | 3,595.60 | 10,461.60 |
| EAB | | | 30,000.00 | 30,000.00 | | | | 7,500.00 | 0.00 | 100% | 25% | | 1,875.00 | 10/06/87 | 762.39 | 2,579.23 |
| EAB | | | 24,212.83 | 24,212.83 | | | | 6,053.21 | 0.00 | 100% | 25% | | 1,513.30 | 12/09/87 | 765.92 | 2,279.64 |
| EAB | PH 029 | | 1,629.15 | 6,582.50 | | | | 1,640.63 | 0.00 | 100% | 25% | | 820.31 | 07/16/88 | 396.01 | 1,271.60 |
| EAB | PH 005 | | | | 16,927.50 | | 901.63 | 1,692.75 | 0.00 | 100% | 25% | | 1,092.76 | 07/15/88 | 484.42 | 1,561.18 |
| EAB | FL 179 | | 28,436.00 | 28,436.00 | | | | 2,843.60 | 0.00 | 100% | 100% | | 0.00 | 01/03/89 | 0.00 | 0.00 |
| MII | Ali034 | | 8,050.00 | 7,800.00 | 250.00 | | | 1,975.00 | 1,500.00 | 100% | 0% | | 415.00 | 09/05/86 | 257.23 | 672.23 |
| MII | Ali032A | | 921.95 | | | | 66.45 | 19.55 | 0.00 | 100% | 0% | | 11.50 | 09/05/86 | 7.29 | 18.79 |
| MII | F1022 | | 6,300.00 | 6,300.00 | 808.50 | | 710.00 | 1,575.00 | 1,260.00 | 100% | 0% | | 31.50 | 12/06/85 | 10.70 | 42.20 |
| MII | A1019 | | | | | | | 163.50 | 0.00 | 100% | 0% | | 150.00 | 12/06/86 | 17.95 | 102.95 |
| McLeod | Ali193 | | 1,050.00 | 1,050.00 | | | | 105.00 | 0.00 | 100% | 0% | | 105.00 | 06/16/87 | 57.73 | 162.73 |
| McLeod | Ali154 | | 7,742.50 | 7,742.50 | | | | 774.25 | 0.00 | 100% | 0% | | 774.25 | 06/16/87 | 425.70 | 1,199.95 |
| McLeod | Ali155 | | 36,247.75 | 38,248.75 | | | | 3,624.38 | 0.00 | 100% | 0% | | 3,624.38 | 06/16/87 | 1,992.75 | 5,617.12 |
| McLeod | Ali82O | | 88,200.00 | | | | | 22,050.00 | 0.00 | 100% | 0% | | 22,050.00 | 06/16/87 | 12,123.46 | 34,173.46 |
| McLeod | Ali63 | | 3,315.00 | 3,315.00 | | | | 331.50 | 0.00 | 100% | 0% | | 331.50 | 06/16/87 | 182.26 | 513.76 |
| McLeod | Ali067 | | 29,000.00 | 29,000.00 | | | | 7,250.00 | 0.00 | 100% | 10% | | 7,250.00 | 07/22/87 | 3,968.16 | 11,200.16 |
| McLeod | FL 005 | | 5,500.00 | 5,500.00 | | | | 1,375.00 | 0.00 | 100% | 0% | | 1,375.00 | 07/22/87 | 743.80 | 2,118.80 |
| McLeod | FL 006 | | 1,351.60 | | 26,050.00 | 15,982.50 | | 270.32 | 0.00 | 100% | 5% | | 270.33 | 07/22/87 | 146.21 | 416.53 |
| McLeod | FL 019 | | 20,000.00 | | | | | 2,000.00 | 0.00 | 100% | 0% | | 210.00 | 03/04/87 | 24.00 | 1,512.10 |
| McLeod | FL 020 | | 1,715.00 | | | 1,600.00 | 14650 | 326.00 | 0.00 | 100% | 10% | | 162.50 | 11/19/88 | 12.72 | 36.72 |
| McLeod | FL 192 | | 3,250.00 | 3,250.00 | | | | 325.00 | 0.00 | 100% | 50% | | 24.00 | 07/10/87 | 00.18 | 230.90 |
| McLeod | FL 123R | | 6,750.00 | 6,750.00 | | | 1,350.00 | 675.00 | 0.00 | 100% | 50% | | 337.50 | 12/20/88 | 138.61 | 476.31 |

FILE:Program2          07/22/93   (11:57 AM)

## Resolution of Programit Claim

| CLIENT NAME | INVOICE | TOTAL | STANDARD SOFTWARE | CUSTOM | RATIO - OTHER HARDWARE | HARDWARE COST | FULL COMM. | PAID % | TIME ADJ. % | AMOUNT OWED | COLLECT DATE | INTEREST | TOTAL OWED |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Thronson | A083 | 17,000.00 | 17,000.00 | | | | 4,250.00 | 0.00 | 100% | 100% | 4,250.00 | 01/10/87 | 2,406.02 | 6,656.02 |
| Shearson | A084 | 14,723.97 | 14,200.00 | | 484.04 | 257.10 | 3,572.69 | 0.00 | 100% | 100% | 3,572.69 | 01/10/87 | 2,023.34 | 5,596.03 |
| Shearson | A085A | 7,333.23 | 7,100.00 | | 221.02 | 129.55 | 1,795.60 | 0.00 | 100% | 100% | 1,795.60 | 01/10/87 | 1,016.03 | 2,811.63 |
| Shearson | A085B | 12,740.34 | 12,600.00 | | 130.20 | | 3,163.02 | 0.00 | 100% | 100% | 3,163.02 | 01/10/87 | 1,791.32 | 4,954.34 |
| Shearson | A086 | 253.20 | | | 210.00 | 80.00 | 13.00 | 0.00 | 100% | 90% | 13.00 | 05/01/87 | 7.29 | 20.29 |
| Shearson | A092 | 1,640.25 | | 250.00 | 170.80 | | 150.00 | 0.00 | 100% | 90% | 150.00 | 05/27/87 | 127.16 | 177.16 |
| Shearson | A093 | 12,420.00 | 2,420.00 | | 1,220.00 | 609.00 | 605.00 | 0.00 | 100% | 100% | 605.00 | 04/10/87 | 342.63 | 947.63 |
| Shearson | A095 | 1,962.00 | | | 140.00 | 62.00 | 35.00 | 0.00 | 100% | 100% | 35.00 | 04/10/87 | 35.11 | 937.11 |
| Shearson | A100 | 3,511.08 | 2,700.00 | | 780.00 | 470.05 | 702.95 | 650.00 | 100% | 100% | (147.05) | 01/23/87 | (65.93) | (212.98) |
| Shearson | A120 | 10.00 | | | 200.00 | 16.50 | 10.00 | 0.00 | 100% | 100% | 10.00 | 03/19/87 | 6.13 | 16.13 |
| Shearson | A122 | 4,541.09 | | | 346.00 | 3,963.77 | 23.13 | 0.00 | 100% | 100% | 23.13 | 03/26/87 | 13.18 | 36.31 |
| Shearson | A130 | 127,931.63 | 127,050.00 | 70,280.00 | 4,195.00 | 615.25 | 17,572.50 | 0.00 | 100% | 100% | 17,572.50 | 04/30/87 | 9,865.36 | 27,437.86 |
| Shearson | A130 | 76,250.00 | 70,280.00 | | 10.00 | | 17,572.50 | 0.00 | 100% | 100% | 17,572.50 | 04/03/87 | 13 | 21,437.86 |
| Shearson | A131 | 1,523.16 | | | 1,500.00 | | 68.20 | 0.00 | 100% | 100% | 68.20 | 03/28/87 | 49.16 | 130.36 |
| Shearson | A141A | 10,614.96 | | 4,590.00 | | 9,752.96 | 1,141.50 | 0.00 | 100% | 100% | 1,141.50 | 05/10/87 | 632.61 | 1,780.11 |
| Shearson | A175 | 52,206.76 | | 47,985.00 | 4,203.76 | 49,277.85 | 478.75 | 0.00 | 25% | 25% | 1,14.75 | 02/26/87 | 250.82 | 721.56 |
| Shearson | A176 | 43,900.00 | 43,900.00 | | | | 10,750.00 | 0.00 | 100% | 100% | 10,750.00 | 08/24/87 | 5,727.70 | 16,477.70 |
| Shearson | PL009 | 18,159.15 | | 16,717.00 | 1,142.15 | 15,315.00 | 137.20 | 0.00 | 25% | 25% | 34.30 | 08/23/87 | 18.45 | 52.75 |
| Shearson | PL016 | 7,600.00 | 7,500.00 | | | 1,905.45 | 1,900.00 | 0.00 | 25% | 25% | 475.00 | 11/04/87 | 214.65 | 1,19.65 |
| Shearson | A213 | 3,171.52 | | | 271.04 | | 93.20 | 0.00 | 100% | 100% | 93.20 | 12/03/87 | 47.31 | 140.51 |
| Shearson | PL035 | 25,245.00 | 6,035.00 | 17,247.00 | 520.00 | 11,939.25 | 2,183.63 | 0.00 | 25% | 25% | 545.90 | 12/09/87 | 276.48 | 822.61 |
| Shearson | A2248R | 16,350.00 | | | | | 1,635.00 | 0.00 | 100% | 10% | 163.50 | 12/12/87 | 82.32 | 245.82 |
| Shearson | A2249R | 4,750.00 | 4,759.00 | | | | 475.00 | 0.00 | 100% | 10% | 47.50 | 12/19/87 | 23.95 | 71.45 |
| Shearson | A2210A | 3,600.00 | 3,600.00 | | | | 360.00 | 0.00 | 100% | 10% | 36.00 | 12/18/87 | 18.15 | 54.15 |
| Shearson | A2217R | 19,315.00 | | 12,246.00 | 1,075.80 | 7,286.00 | 194.40 | 0.00 | 10% | 10% | 194.40 | 01/08/88 | 95.53 | 739.03 |
| Shearson | A285 | 27,300.00 | 27,300.00 | | | | 6,825.00 | 0.00 | 100% | 100% | 6,825.00 | 01/08/88 | 3,235.57 | 10,081.57 |
| Shearson | A286 | 500.00 | | 500.00 | | | 50.00 | 0.00 | 5% | 5% | 2.50 | 03/30/88 | 1.10 | 3.70 |
| Shearson | A285R | 500.00 | | 500.00 | | | 50.00 | 0.00 | 5% | 5% | 25.00 | 06/00/88 | 517.22 | 542.55 |
| Shearson | PL7/n3 | 14,049.76 | 43,765.00 | 25,738.00 | 3,264.76 | 4,530.50 | 4,078.50 | 0.00 | 100% | 100% | 4,078.50 | 06/00/88 | 1,821.19 | 5,899.69 |
| Wellington | A183 | 9,936.18 | | 6,390.00 | 540.18 | 4,482.30 | 189.77 | 0.00 | 100% | 50% | 94.89 | 12/03/87 | 48.19 | 143.08 |
| Wellington | A184 | 900.00 | 3,900.00 | | | | 975.00 | 0.00 | 100% | 50% | 487.50 | 12/03/87 | 247.61 | 735.11 |
| Wellington | A219 | 38,052.00 | | | 36,717.00 | 27,227.65 | 943.84 | 0.00 | 100% | 5% | 47.20 | 12/31/87 | 23.65 | 70.81 |
| Wellington | A256 | 6,930.00 | 6,930.00 | | | | 1,732.50 | 0.00 | 100% | 5% | 86.63 | 12/31/87 | 43.60 | 130.03 |
| Wellington | A269 | 28,700.00 | 12,870.00 | | | | 3,217.50 | 0.00 | 100% | 2.5% | 60.44 | 04/25/88 | 39.00 | 118.44 |
| Wellington | A2/9 | 3,084.00 | | | | | 300.00 | 0.00 | 100% | 5% | 7.50 | 04/25/88 | 3.54 | 11.04 |
| Wellington | PL16/n | 3,201.49 | | 3,000.00 | 81.00 | | 298.75 | 0.00 | 100% | 50% | 147.86 | 01/13/88 | 60.27 | 208.15 |
| TOTALS | | | | | | | | | | | $120,940.69 | | $64,936.03 | $185,495.72 |

| | |
|---|---|
| AMOUNT OWED + INTEREST = TOTAL OWED | |
| DAILY INTEREST x (TODAY - COLLECT DATE = ?) x AMOUNT OWED = INTEREST | 3,000.00 / 81.00 / 24.99 |
| DAILY INTEREST = (9%)/366 = .0002465 | 2,857.50 / 24.99 |
| (FULL COMMISSION - COMMISSION PAID) x ADJ. % = AMOUNT OWED | |
| (25% x STANDARD) + (10% x CUSTOM) + (10% x (HARDWARE - HARDWARE COST)) = FULL COMMISSION | |

### Formulas

# EXHIBIT C

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK  :  IAS PART 9
-----------------------------------------X

BILL ROTHFARB,

                                Plaintiff,

                -against-

PROGRAMIT, INC., MARSHALL CARO and
JOHN O'BRIEN, individually and jointly
doing business as partners under the
name of PROTECTIT TECHNOLOGY,
ASSOCIATED IMPERATIVES, LTD., a New .
York corporation, and doing business
under the name of PROTECTIT, PI SYSTEMS,
LTD., a New York corporation, and doing
business under the name of PROGRAMIT,
MARSHALL CARO and HUGH N. FRYER,

                                Defendants.

-----------------------------------------X

Index No. 19178/87
Cal. No. 90L-03165.

DECISION AFTER TRIAL

KARLA MOSKOWITZ, J.:

This matter was tried before me on December 13, 14, 1990,
January 11, 1991, July 10, 12 and 15, 1991.  The parties
submitted post-trial memoranda, reply memoranda and proposed
findings of fact and conclusions of law and the record has
closed.

                        FACTS

Defendant Marshall Caro originally formed a computer
consulting corporation named Programit, Inc. ("Programit") in New
Jersey sometime in 1978 and operated that business for a number
of years (Tr. 314).  In the early 1980's, the New Jersey entity
ceased doing business, although it was never formally dissolved
(Tr. 316).  Caro formed a New York corporation under the same
name, and that entity is one of the defendants in this action
(Tr. 315).  Programit was in the package computer software

business and sold accessory products for various data systems to financial service firms (Tr. 252-253).

In late 1983, Caro and John O'Brien[1] formed a partnership known as Protectit Technology ("Protectit"), that also developed and sold software systems. Protectit and Programit both did business under the name Programit (Tr. 331).

In February 1985, Programit hired plaintiff Bill Rothfarb as a salesman. It is clear that Rothfarb was hired not because of his prowess as a salesman, but rather for his technical expertise and numerous contacts within the industry that Programit hoped would open doors for it (Tr. 17, 397).

On July 31, 1985, Rothfarb, and Caro and O'Brien on behalf of Programit and Protectit, entered into a Sales Compensation Agreement (the "Agreement"), effective February 1, 1985, which delineated the commissions Rothfarb would receive from the sale of various products and services. The Agreement provides in pertinent part:

> This agreement sets forth the terms under which Bill Rothfarb will sell the products and services of PROGRAMIT, Inc., PROTECTIT TECHNOLOGY, Inc. and any successor corporations hereinafter called "the Company."
>
> 1. COMMISSION
> The Company will pay Bill Rothfarb the following commissions:
>
> Self-generated sales situations
> | Non-custom products | 25% |
> | Custom services | 10% |
> | Hardware pass-through | 10% |

--------------------------
1. Plaintiff originally named O'Brien as a defendant in this action but subsequently released him.

Adjusted Cooperation Rate (with G. Blanco)
Non-custom products          5-23%
Custom services              2-8%
Hardware pass-through         2-8%

Company-generated sales situations
Non-custom products          20%
Custom services              10%
Hardware pass-through         10%

All commission payments are due within three
days of receipt of payment by the Company.

Should this agreement be terminated the
Company will pay Bill Rothfarb all
commissions, as stated above, for all
contracts signed during the period of the
agreement, and according to the following
schedule of the above stated commissions for a
period of 12 months following termination for
all other sales from clients contacted by Bill
Rothfarb during the period of the agreement:

TERMINATION SCHEDULE

| Time | % AGE OF STATED COMMISSIONS |
|------|------------------------------|
| 0-1 months | 50% |
| 2-5 months | 25% |
| 6-9 months | 10% |
| 9-12 months | 5% |

2. EQUITY
In exchange for Bill Rothfarb's contribution,
over time, the Company hereby grants him a
total of 2% equity according to the following
schedule:

A 2% upfront grant for .0001 cents per share.
The Company has buy back rights (at the same
price) prorated monthly over an 18 months
period ... .

(Plaintiff's Exh. 1).

Subsequent to Rothfarb's hiring, Caro formed yet another
corporation in New York, Associated Imperatives, Ltd.
("Associated"). Associated continued both Programit's and
Protectit's business and continued to use Programit on
corporation stationary (Tr. 330-332). There is no dispute that

Associated is a successor corporation contemplated by the Agreement (Tr. 148-50). Caro, in 1987, formed defendant PI Systems, Ltd. (PI Systems"), which began operations in June 1987. Caro testified that

> I made the determination in that I would be far better off withdrawing [from Associated] to the extent that I could without jeopardizing people that I had made promises to, i.e., the customers and doing business under my own name where everything that I contributed would go towards building value in something that was mine as opposed to something that was only partially mine. And also something that did not have a defused interest in all these cockamamie products that Mr. O'Brien and Mr. Rothfarb schemed up ... . So for that reason I set up shop on my own and engaged in agreements with the respective.... customers ... in a manner that would be fairer to me and fairer to all parties concerned.

(Tr. 381-82).

In February 1987, before formation of PI Systems, Caro terminated Rothfarb's employment and instructed Rothfarb to cease all business dealings on behalf of Programit.

I find that plaintiff was credible and knowledgeable of the issues. On the other hand, defendant Caro was not credible and his testimony unclear and contradictory.

The first issue is whether PI Systems is a successor corporation to Associated and, therefore, subject to the Agreement. I find that it is.

During testimony, it became clear that PI Systems carried the same merchandise as Associated, employed the same personnel, retained the same customers (who never received notifications of any corporate change), used the Programit name, shared the same

office space with Associated, had the same telephone number that was answered "Programit", and had "Programit" prominently displayed on its letterhead (Tr. 380-392). Further, Caro transferred software licenses he owned from Associated to PI Systems, a transaction that Caro testified was fairer to him (Tr. 390-394). In addition, Caro testified that Associated rented office space to PI Systems but did not produce an executed lease. No evidence indicates that PI Systems was anything but a successor to Associated.. PI Systems simply became the next corporate entity in line to do business as Programit. Thus, this court holds that PI Systems is a successor corporation of Associated for the purposes of liability under the Agreement.

With regard to Caro's personal liability, it is clear that under normal circumstances, a corporation's independent existence should not be ignored (Matter of Seagroatt Floral Co. [Riccardi], 78 NY2d 439, 450; Port Chester Elec. Constr. Corp. v. Atlas, 40 NY2d 652, 656). However, a court may pierce the corporate veil if it is demonstrated that the corporate form was disregarded and that the individual exercised such control over the corporation that it became the alter ego, a vehicle for personal rather than corporate ends (see,. Feigen v. Advance Capital Mgt. Corp., 150 AD2d 281, appeal dismissed in part, denied in part, 74 NY2d 874; Bonanni v. Straight Arrow Publishers, 133 AD2d 585).

Testimony revealed Caro's cavalier use of the corporate form through his succession of companies beginning with Programit, New Jersey, which was abandoned but never dissolved, to Programit, New York and Protectit, neither of which was dissolved but which

merged to form Associated and then PI Systems. Although at trial Caro indicated that he believed Associated still existed, it is clear that PI Systems has taken over Associated's employees, customers, offices and the use of the Programit name. Further, Caro licensed his software creations to these companies through non-exclusive license agreements which he revoked at will when a new corporate entity became more attractive or appeared "fairer" to him. The final transfer from Associated to PI Systems is nothing more than a transparent attempt to shield Caro's profits from the liabilities it incurred under the Agreement and constitutes a blatant disregard of the corporate form. As a result, this court holds that Caro is jointly and severally liable for plaintiff's damages.

Plaintiff claims two percent equity in defendant corporations. The Agreement specifically provides:

> 2. EQUITY
> In exchange for Bill Rothfarb's contribution, over time, the Company hereby grants him a total of 2% equity according to the following schedule:
>
> A 2% upfront grant for .0001 cents per share. The Company has buy back rights (at the same price) prorated monthly over an 18 months period ... .
>
> The equity granted under this clause shall have full voting rights, transfer rights, shall be dilutable in the same ratio as all other employee/Founder stock, and shall have the right to be pro-rata included in any registrations, offerings or sales. the Company shall have the right of first refusal in the sale of this equity stake to any non relative of Bill Rothfarb.

(Plaintiff's Exh. 1).

A:±1917887/DEC09    PAGE 6

There is no dispute that plaintiff fully paid for this two percent equity interest, but Caro did not have the shares issued to plaintiff nor did defendants exercise the Agreement's buyback provision (Tr. 29-31, 334). Accordingly, plaintiff is entitled to a two percent equity interest in Programit, Inc. and Protectit Technology, Inc. and any successor corporations.

At trial, this court, in considering the defendants' motion for judgment at the close of plaintiff's case, concluded that

> The fact is that there is liability on the contract. There is enough evidence to support the contention of the plaintiff that the contract should be read the way he is saying it should be read, and the only problem I have is I think that the clear reading of the contract on the particular commissions attributable to any contracts that were entered into after he left doesn't support the plaintiff's reading, and as to that part of it, as a matter of law, I don't see any reading that could be anyway, that any factfinder could find that contract entered into, after any determination of the employment agreement entitles commissions on the amount urged by the plaintiff, especially, where this contract is with, in effect, a company he went to work for, and that's my reading of it .... .

(Tr. 246).

The court also rejects the plaintiff's argument concerning master license agreements. Rothfarb contends that these agreements form an "umbrella relationship" with a particular client which entitles him to all future sales to that client regardless of whether Rothfarb actually negotiated the future sales or was still in Programit's employ.

Rothfarb's position is belied both by common sense and a reading of the Termination Schedule in the Agreement that

provides for a sliding scale of commissions after Rothfarb's departure, a clear indication of the parties' intention to limit commissions after Rothfarb's termination. Further, O'Brien's testimony also indicates that commissions under the license agreements were to be limited and were not considered perpetual (Tr. 544).

The court finds that the plaintiff is entitled to commissions on the items listed in the schedules contained in the license agreements, that were executed while he was in Programit's employ, at the rates set forth in the Agreement and for all sales made to that client after his departure pursuant to the Termination Schedule.

This court agrees with the plaintiff that he is entitled to commissions under the maintenance contracts. The Agreement does not differentiate between the types of contracts Rothfarb negotiated during his tenure, but merely states: "[Programit] will pay Bill Rothfarb all commission ... for all contracts signed during the period of the agreement ... ." The defendants cannot, and do not, dispute that the maintenance contracts are a source of revenue for Programit and proffer no acceptable rationale why they should not be considered contracts under the Agreement's terms. However, the defendants do establish that the maintenance contracts are subject to the lower customized services commission rate because each system breakdown would be unique and would require "custom" rather than standard attention.

With regard to the customized/non-customized commission rates and how they should be applied to the various accounts, it

A:±1917887/DEC09     PAGE 8

is imperative that the intentions of the parties be given effect in interpreting the Agreement. In determining those intentions, the court may look to the surrounding acts and circumstances as well as the performance of the parties under the Agreement before the breach. Bearing this in mind, and after review of the documentary evidence and the testimony, this court rejects the defendants' attempt to now impose a lower commission rate in those instances where Rothfarb, during the term of his employment, was paid the maximum, non-customized commission rate of twenty-five percent. Further, this court finds that the lower, adjusted-cooperation rate does not apply to reduce commissions paid pursuant to the Termination Schedule of the Agreement.

Thus, the defendants' counterclaim in the nature of a payback/offset is dismissed, and the defendants are liable to the plaintiff on these accounts as follows:

1. Bankers Trust: 10% commission on the entire sale, including the July 21, 1987 invoice.

2. Bierbaum - Martin: 10% commission on the entire sale, including the July 21, 1987 invoice.

3. Drexel: 25% commission as this court holds that an agreement did exist between Rothfarb and Blanco and that Caro was aware of it.

4. European American Bank: 10% customized rate on maintenance contract, commissions received as result of pilot system sale and all other sales and maintenance contract occurring during 12 month termination schedule to be paid pursuant to the sliding scale.

5. First Boston: no commission.

6.   Imnet:  .25% commission.

7.   Morgan Grenfeld:  no money to be returned
     to defendants by Rothfarb.

8.   Manufacturers:   self-generated sale at
     the non-customized rate of commission.

9.   McLeod Young Weir:  25% commission.

10.  Shearson:   25% commission for products
     sold prior to termination and for those
     delivered after termination but listed in
     schedule of original contract.  Separate
     sales occurring after termination subject
     to sliding scale of commissions.   Also,
     entitled  to  10%  of  spread  on  Warner
     sales.

The  last  issue  before  this  court  is  the  plaintiff's
eleventh-hour request for attorneys' fees and liquidated damages
pursuant to Labor Law §198(1-a), which states, inter alia:

> In any action instituted upon a wage claim by
> an  employee  ...  in  which  the  employee
> prevails, the court shall allow such employee
> reasonable attorney's fees and, upon a finding
> that the employer's failure to pay the wage
> required  by  this  article  was  willful,  an
> additional amount as liquidated damages equal
> to twenty-five percent of the total amount of
> the wages found to be due.  (emphasis added)

Despite  the  defendants'  assertions  to  the  contrary,  the
plaintiff is the type of employee entitled to an award of
attorney's fees and liquidated damages as contemplated by Labor
Law §198 (see, Daley v. Related Cos., 179 AD2d 55; Gottlieb v.
Kenneth Laub & Co., 184 AD2d 429, 585 NYS2d 395). The plaintiff,
however, failed to raise his Labor Law claims in his complaint,
amended complaint or at trial and, since the issue of willfulness
was, therefore, never raised or addressed, the plaintiff is not
entitled to liquidated damages.     The plaintiff is, however,

entitled to reasonable attorneys' fees as an employee successful on a wage claim (see, Westheim v. Elkay Indus., 166 AD2d 318), which fees will be determined at a hearing before a special referee.

The parties shall settle judgment in accordance with the foregoing conclusions of fact and law. The judgment shall include detailed, readable and clear accounting statements with itemizations for the accounts concerned, with the invoices and the percentages applied to the invoices to calculate the commissions, based on the evidence at trial, and provide for issuance of stock to plaintiff in conformity with the foregoing finding that plaintiff is entitled to a two percent equity in defendant corporations.

The judgment shall also provide for severance of the claim for attorneys' fees and a special referee's hearing as to amount.

Settle judgment.

KARLA MOSKOWITZ
J. S. C.

Dated: May 3, 1993

FILED
MAY 1 1 1993
COUNTY CLERK'S OFFICE
NEW YORK

# EXHIBIT D



SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

BILL ROTHFARB,

                    Plaintiff,                    Index No. 19178/87

              -against-

PROGRAMIT, INC., PROTECTIT TECHNOLOGY,           NOTICE OF APPEAL
ASSOCIATED IMPERATIVES, LTD., P.I.
SYSTEMS, LTD. and MARSHALL CARO

                    Defendants.

PLEASE TAKE NOTICE, that defendants Programit, Inc.,
Protectit Technology, Associated Imperatives, Ltd.,
P.I.Systems, Ltd. and Marshall Caro hereby appeal to the
Appellate Division of the Supreme Court, First Depart-
ment, from the Judgment and Order of this Court, in favor
of the above named plaintiff against the above named
defendants in the amount of $204,918.23 and also granting
certain other relief, entered in the office of the Clerk
of the County of New York on March 28, 1995, and this
appeal is taken from each and every part of that judgment
as well as the whole thereof.

Dated:      April 27, 1995
            New York, New York

                         FRYER & ROSS
                         Attorneys for Defendants
                         551 Fifth Avenue
                         New York, New York 10176
                         (212) 286-0099

TO:

CLERK OF THE SUPREME COURT
OF THE STATE OF NEW YORK
60 Centre Street
New York, New York 10007

STECHER JAGLOM & PRUTZMAN
Attorneys for Plaintiff
900 Third Avenue, Suite 1200
New York, New York 10022
(212) 335-4000

## AFFIDAVIT OF SERVICE BY MAIL

STATE OF NEW YORK      }  SS.:
COUNTY OF NEW YORK   }

Barbara Cooper, being duly sworn, deposes as follows:

I am over 18 years of age and not a party to this proceeding. I reside at 160-12 89th Street, Howard Beach, New York 11414.

On April 27, 1995, I served true copies of :

· Notice of Appeal
Pre-Argument Statement

· Upon: Stecher Jaglom & Prutzman
900 Third Avenue, Suite 1200
New York, New York 10022

by enclosing the same in a postpaid sealed wrapper properly addressed to the said attorney at his office and deposited said wrapper in a post office depository under the exclusive care and custody of the United States Postal Service within New York State.

Dated: April 27, 1995

Barbara Cooper

Subscribed and sworn to before me on
April 27, 1995

Notary Public

HUGH N. FRYER
NOTARY PUBLIC, State of New York
No. 31-8425649
Qualified in New York County
Commission Expires Jan. 31, 1997

FILED
COUNTY CLERK
N.Y. COUNTY

95 APR 27 PM 2: 49

# EXHIBIT E

emely Urgent

This envelope is for use with the following services:

UPS Next Day Air®
UPS Worldwide Express®
UPS 2nd Day Air®

Insert shipping documents under window from the top.

Page 1 of 1

P: RED   8:00:10

16B - 4451

127R14F503D034 7461

Print Label

| (1-800-742-5877)

GREENWICH CT 06831-3634

MARSHALL CARD
47 ANGELUS DR

CHRISTIAN JERI
(617) 563-0911
FIDELITY INVESTMENTS-CDS WTC
200 SEAPORT BLVD
BOSTON MA 02210

SHIP
TO      (203) 653-5043
        MARSHALL CARD
        47 ANGELUS DR

1 LBS

1 OF 1

GREENWICH CT 06831-3634



CT 069 9-01



UPS GROUND

TRACKING #:   1Z 7R1 4F5 03 0034 7461



BILLING: P/P

Ship Date: 09/03/10
Reference: 15541

Bill No.: 250000315475
Reference 2: 250000315475
PBE 0079 PEBGRAPHIC 08.SV 07/2010

indow En

is envelope with s
r5A printer on plain paper.

 **Proof of Delivery**

Dear Customer,

This notice serves as proof of delivery for the shipment listed below.

| | |
|---|---|
| **Tracking Number:** | 1Z7R14F50300347461 |
| **Service:** | GROUND |
| **Weight:** | .10 Lb |
| **Shipped/Billed On:** | 09/03/2010 |
| **Delivered On:** | 09/07/2010 12:49 P.M. |
| **Delivered To:** | GREENWICH, CT, US |
| **Location:** | REAR PORCH |

Thank you for giving us this opportunity to serve you.

Sincerely,

UPS

Tracking results provided by UPS:   09/08/2010 6:36 A.M.   ET

PO Box 770001
Cincinnati, OH 45277-0031



September 03, 2010

MARSHALL CARO
47 ANGELUS DR
GREENWICH, CT 06831-3634

Re:     Bill Rothfarb v. Programit Inc. and Marshall Caro
        Case No.: 19178/87
        Fidelity File No.: W704359-31AUG10

Dear Mr. Caro:

I am writing to confirm receipt of the Restraining Notice dated August 25, 2010, in connection
with the above referenced matter. A copy of the Restraining Notice, Exemption Notice and two
copies of the Exemption Claim form are enclosed.

Accordingly, we have permanently restricted Fidelity account XXX-XX3272. The restriction
will remain pending a currently (within the last 60 days) and originally certified (with raised or
colored seal) Court Order, or other process issued by a court of competent jurisdiction ordering
the release of the account XXX-XX3272.

Please send all future correspondence to Fidelity Investments, Attention: Risk Operations, P.O.
Box 770001, Cincinnati, OH 45277-0031. Overnight or certified mail can be sent to Fidelity
Investments, Attention: Risk Operations, 100 Crosby Pkwy, KC1D, Covington, KY 41015-0031.

If you have any questions, please call me at (617) 563-8911, between 8:30 a.m. and 5:00 p.m.
Eastern time, Monday - Friday.

Sincerely,

Christian Jeri
Risk Analyst

cc:     Evan Rothfarb, Esq
        11 Broadway, Ste. 615
        New York, NY 10004

Enclosure

Clearing, custody or other brokerage services provided by National Financial Services LLC or Fidelity Brokerage Services LLC, Member NYSE, SIPC

(Page 2 of

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

BILL ROTHFARB

Plaintiff,

-against-

PROGRAMIT, INC.,
MARSHALL CARO,
PROTECTIT TECHNOLOGY,
ASSOCIATED IMPERATIVES, LTD., and
P.I. SYSTEMS, LTD.,

Defendants.

---

Index No. 19178/87

(Gische, J.)

RESTRAINING NOTICE

RE:    *Rothfarb v. Programit, Inc. et al.,* funds of Marshall A. Caro, Defendant and Judgment
       Debtor, Social Security Number 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, with home address located at 47 Angelus
       Drive, Greenwich, CT 06831
       (OUR FILE NUMBER: 00005-ROTHFARB)

## THE PEOPLE OF THE STATE OF NEW YORK

TO:    Fidelity Brokerage Services LLC d/b/a Fidelity Investments
       c/o Thompson Hine, LLP
       Attn: Michael G. Shannon, Esq.
       335 Madison Avenue – 12th Floor
       New York, NY 10017-4611

## RESTRAINING NOTICE

WHEREAS, in an action in the Supreme Court of New York, New York County,
between BILL ROTHFARB as plaintiff and PROGRAMIT, INC., MARSHALL CARO,
PROTECTIT TECHNOLOGY, ASSOCIATED IMPERATIVES, LTD., and P.I. SYSTEMS,
LTD., defendant(s) who are all the parties in said action, a judgment was entered in favor of
BILL ROTHFARB as judgment creditor and against MARSHALL CARO as judgment debtor
in the amount of $204,018.23 of which the entire amount together with interest thereon at 9%
annually from March 28, 1995 remains due and unpaid and is now equal to more than
**$486,000.00**; and

Page 1 of 3

FIMS_RETAIL:530222760

WHEREAS, FIDELITY BROKERAGE SERVICES LLC doing business as FIDELITY INVESTMENTS (hereinafter, "Fidelity") resides and has an office for the regular transaction of business in person in New York County.

WHEREAS, it appears that Fidelity is in possession of property in which the judgment debtor Marshall Caro has an interest located in account number XXX-XX3272;

TAKE NOTICE that pursuant to subdivision (b) of Section 5222 of the Civil Practice Law and Rules, which is set forth in full herein, you are hereby forbidden to make or suffer any sale, assignment or transfer of, or any interference with, any such property contained in account number XXX-XX3272 or to pay over or otherwise dispose of any such property contained therein except as therein provided.

TAKE FURTHER NOTICE that this notice also covers all property in which the judgment debtor has an interest hereafter coming into your possession or custody in account number XXX-XX3272.

## CIVIL PRACTICE LAW AND RULES

Section 5222(b) Effect of restraint; prohibition of transfer; duration. A judgment debtor or obligor served with a restraining notice is forbidden to make or suffer any sale, assignment, transfer or interference with any property in which he or she has an interest, except as set forth in subdivisions (h) and (i) of this section, and except upon direction of the sheriff or pursuant to an order of the court, until the judgment or order is satisfied or vacated. A restraining notice served upon a person other than the judgment debtor or obligor is effective only if, at the time of service, he or she owes a debt to the judgment debtor or obligor or he or she is in the possession or custody of property in which he or she knows or has reason to believe the judgment debtor or obligor has an interest, or if the judgment creditor or support collection unit has stated in the notice that a specified debt is owed by the person served to the judgment debtor or obligor or that the judgment debtor or obligor has an interest in specified property in the possession or custody of the person served. All property in which the judgment debtor or obligor is known or believed to have an interest then in and thereafter coming into possession or custody of such a person, including any specified in the notice, and all debts of such a person, including any specified in the notice, then due and thereafter coming due to the judgment debtor or obligor, shall be subject to the notice except as set forth in subdivisions (h) and (i) of this section. Such a person is forbidden to make or suffer any sale, assignment or transfer of, or any interference with, any such property, or pay over or otherwise dispose of any such debt, to any person other than the sheriff or the support collection unit, except as set forth in subdivisions (h) and (i) of this section, and except upon direction of the sheriff or pursuant to an order of the court, until the expiration of one year after the notice is served upon him or her, or until the judgment or order is satisfied or vacated, whichever event first occurs. A judgment creditor or support collection unit which has specified personal property or debt in a restraining notice shall be liable to the owner of the property or the person to whom the debt is owed, if other than the judgment debtor or obligor, for any damages sustained by reason of the restraint. If a garnishee served with a restraining notice withholds the payment of money belonging or owed to the judgment debtor or obligor in an amount equal to twice the amount due on the judgment or order, the restraining notice is not effective as to other property or money.

Aug 31 2010 08:52:00    16178580733    -> Fidelity Investments Fidelity Investments  Page 004

**TAKE FURTHER NOTICE** that disobedience of this Restraining Notice is punishable as contempt of court.

New York, New York
Dated: August 25, 2010

ROTHFARB LAW, PLLC

By: _Evan S. Rothfarb_
Evan S. Rothfarb
11 Broadway, Suite 615
New York, NY 10004
(212) 480-1010
*Attorneys for Plaintiff and Judgment*
*Creditor Bill Rothfarb*

FIMS_RETAIL:530222760

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| BILL ROTHFARB | Index No. 19178/87 |
| Plaintiff, | |
| -against- | **EXEMPTION NOTICE** |
| PROGRAMIT, INC., MARSHALL CARO, PROTECTIT TECHNOLOGY, ASSOCIATED IMPERATIVES, LTD., and P.I. SYSTEMS, LTD., | |
| Defendants. | |

**EXEMPTION NOTICE**

As required by New York Law

**YOUR BANK ACCOUNT IS RESTRAINED OR "FROZEN"**

The attached Restraining Notice or notice of Levy by Execution has been issued against your bank account. You are receiving this notice because a creditor has obtained a money judgment against you, and one or more of your bank accounts has been restrained to pay the judgment. A money judgment is a court's decision that you owe money to a creditor. You should be aware that FUTURE DEPOSITS into your account(s) might also be restrained if you do not respond to this notice.

You may be able to "vacate" (remove) the judgment. If the judgment is vacated, your bank account will be released. Consult an attorney (including free legal services) or visit the court clerk for more information about how to do this.

Under state and federal law, certain types of funds cannot be taken from your bank account to pay a judgment. Such money is said to be "exempt."

DOES YOUR BANK ACCOUNT CONTAIN ANY OF THE FOLLOWING TYPES OF FUNDS?

    1. Social Security;

    2. Social security disability (SSD);

    3. Supplement security income (SSI);

Page 1 of 2

4. Public assistance (welfare);

5. Income earned while receiving SSI or public assistance;

6. Veterans benefits;

7. Unemployment insurance;

8. Payments from pensions and retirement accounts;

9. Disability benefits;

10. Income earned in the last 60 days (90% of which is exempt);

11. Workers' compensation;

12. Child support;

13. Spousal support or maintenance (alimony);

14. Railroad retirement; and/or

15. Black lung benefits

If YES, you can claim that your money is exempt and cannot be taken.

To make the claim, you must

    a) complete the EXEMPTION CLAIM FORM attached;

    b) deliver or mail the form to the bank with the restrained or "frozen" account; and

    c) deliver or mail the form to the creditor or its attorney at the address listed on the form.

You must send the forms within 20 DAYS of the postmarked date on the envelope holding this notice. You may be able to get your account released faster if you send to the creditor or its attorney written proof that your money is exempt. Proof can include an award letter from the government, an annual statement from your pension, pay stubs, copies of checks, bank records showing the last two months of account activity, or other papers showing that the money in your bank account is exempt. If you send the creditor's attorney proof that the money in your account is exempt, the attorney must release that money within seven days. You do not need an attorney to make an exemption claim using the form.

FIMS_RETAIL:530222760

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

BILL ROTHFARB

Plaintiff,

-against-

PROGRAMIT, INC.,
MARSHALL CARO,
PROTECTIT TECHNOLOGY,
ASSOCIATED IMPERATIVES, LTD., and
P.I. SYSTEMS, LTD.,

Defendants.

Index No. 19178/87

**EXEMPTION CLAIM FORM**

## EXEMPTION CLAIM FORM

NAME AND ADDRESS OF JUDGMENT
CREDITOR OR ATTORNEY

(To be completed by judgment creditor or
attorney)

### ADDRESS A

Rothfarb Law, PLLC
Attn: Evan S. Rothfarb
11 Broadway, Suite 615
New York, NY 10004

NAME AND ADDRESS OF FINANCIAL
INSTITUTION

(To be completed by judgment creditor or
attorney)

### ADDRESS B

Fidelity Investments
100 Crosby Parkway – KC1D
Covington, KY 41015-0031

**Directions:** To claim that some or all of the funds in your account are exempt, complete both
copies of this form, and make one copy for yourself. Mail or deliver one form to ADDRESS A
and one form to ADDRESS B within 20 days of the date on the envelope holding this notice.

**If you have any documents, such as an award letter, an annual statement from your pension,
paystubs, copies of checks or bank records showing the last two months of account activity,
include copies of the documents with this form. Your account may be released more quickly.

Page 1 of 2

FIMS_RETAIL:530222760

I state that my account contains the following type(s) of funds (check all that apply):

    __ Social Security

    __ Social security disability (SSD)

    __ Supplement security income (SSI)

    __ Public assistance

    __ Wages while receiving SSI or public assistance

    __ Veterans benefits

    __ Unemployment insurance

    __ Payments from pensions and retirement accounts

    __ Income earned in the last 60 days (90% of which is exempt)

    __ Child support

    __ Spousal support or maintenance (alimony)

    __ Workers' compensation

    __ Railroad retirement or black lung benefits

    __ Other (describe exemption): _____

I request that any correspondence to me regarding my claim be sent to the following address:

_____

(FILL IN YOUR COMPLETE ADDRESS)

I certify under penalty of perjury that the statement above is true to the best of my knowledge and belief.

DATE: _____, _____

                                            By: _____

                                               SIGNATURE OF JUDGMENT DEBTOR

FIMS_RETAIL:53Q222760

# EXHIBIT F

Page 24 of 28)

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

BILL ROTHFARB

                    Plaintiff,

          -against-

PROGRAMIT, INC.,
MARSHALL CARO,
PROTECTIT TECHNOLOGY,
ASSOCIATED IMPERATIVES, LTD., and
P.I. SYSTEMS, LTD.,

                    Defendants.

Index No. 19178/87

**EXEMPTION CLAIM FORM**

---

**EXEMPTION CLAIM FORM**

NAME AND ADDRESS OF JUDGMENT
CREDITOR OR ATTORNEY

(To be completed by judgment creditor or
attorney)

**ADDRESS A**

Rothfarb Law, PLLC
Evan S. Rothfarb
11 Broadway, Suite 615
New York, NY 10004

NAME AND ADDRESS OF FINANCIAL
INSTITUTION

(To be completed by judgment creditor or
attorney)

**ADDRESS B**

Fidelity Investments
100 Crosby Parkway — KC1D
Covington, KY 41015-0031

**Directions:** To claim that some or all of the funds in your account are exempt, complete both
copies of this form, and make one copy for yourself. Mail or deliver one form to ADDRESS A
and one form to ADDRESS B within 20 days of the date on the envelope holding this notice.

**If you have any documents, such as an award letter, an annual statement from your pension,
paystubs, copies of checks or bank records showing the last two months of account activity,
include copies of the documents with this form. Your account may be released more quickly.

Page 1 of 2

FIMS_RETAIL:524271400

I state that my account contains the following type(s) of funds (check all that apply):

☑ Social Security

___ Social security disability (SSD)

___ Supplement security income (SSI)

___ Public assistance

___ Wages while receiving SSI or public assistance

___ Veterans benefits

☑ Unemployment insurance

☑ Payments from pensions and retirement accounts

___ Income earned in the last 60 days (90% of which is exempt)

___ Child support

☑ Spousal support or maintenance (alimony)

___ Workers' compensation

___ Railroad retirement or black lung benefits

☑ Other (describe exemption): _____

I MARSHALL CARO swear that that all funds and all other assets in all of my accounts at Fidelity Investments are exempt from levy or attachment by a judgment creditor pursuant to NY CPLR § 5205 or are otherwise exempt pursuant to NY CLPR § 5222(i). The total amount of funds and assets I hold at Fidelity Investments that are not exempt pursuant to § 5205 are less than the statutory exemption amount of $1740 specified in § 5222(i).

I attach hereto the last four statements of my Fidelity account as proofs of the foregoing.

Attorney Rothfarb was notified on July 27th by Fidelity (letter attached hereto) that they had erred by freezing a partnership account -- it is not an account of any named defendants and does not hold any non-exempt funds or assets of any defendant.

I request that any correspondence to me regarding my claim be sent to the following address:

Marshall Caro
47 Angelus Drive
Greenwich, CT 06831

I certify under penalty of perjury that the statement above is true and accurate to the best of my knowledge and belief.

DATE: <u>August 5th, 2010</u>

& September 8th, 2010

By: _____
Marshall Caro

Page 2 of 2

08/02/2010 16:08 FAX  6174760589          FIDELITY-INVESTMENTS                    @001/001

PO Box 770001
Cincinnati, OH 45277-0001



July 30, 2010

Evan Rothfarb
Rothfarb Law, PLLC
11 Broadway, Ste 615
New York, NY 10004

Re:     Bill Rothfarb, Plaintiff
        v.
        Programit, Inc., Marshall Caro, Defendants
        Case No.: 049852/10
        Fidelity File No.: W077837-20JUL10

Dear Mr. Rothfarb:

This letter serves as amended response to my letter to you dated July 27, 2010, in connection with
the above-referenced matter.

This response is made on behalf of Fidelity Brokerage Services LLC ("FBS") and on behalf of no
other entity.

My previous letter indicated that FBS would keep Fidelity account xxx-xx0020 restricted unless
FBS was released as Garnishee, or would release the account upon the expiration of one year,
whichever comes first.

Please note that, upon further review, we have determined that the Partnership account in which
the defendant holds an interest may be exempt.

Accordingly, we will keep this account restricted for an additional five business days from the
date of this letter (July 30, 2010). If we do not receive the proper documents (a court order,
restraining order or other process issued by a court of competent jurisdiction, which orders FBS
to restrict this account) by August 5, 2010, we will remove the restriction. FBS leaves it to
litigation between the parties to determine whether such assets are attachable.

Please send all future correspondence to Fidelity Investments, Attention: Risk Operations, P. O.
Box 770001, Cincinnati, OH 45277-0031. Overnight or certified mail can be sent to Fidelity
Investments, Attention: Risk Operations, 100 Crosby Pkwy, KC1D, Covington, KY 41015-0031.

If you have any questions, please call me at (617) 563-8911, between 8:30 a.m. and 5:00 p.m.
Eastern time.

Sincerely,

Christian Peri
Fidelity Risk Management

Cc:     Marshall Caro

Clearing, custody or other brokerage services provided by National Financial Services LLC or Fidelity Brokerage Services LLC, Member NYSE, SIPC

# Fidelity
IN V E S T M E N T S

*Premium Services*

Envelope 902259772

MARSHALL CARO
47 ANGELUS DR
GREENWICH CT 06831-3634

## Investment Report

July 1, 2010 - July 31, 2010

Online
FAST(sm)-Automated Telephone
Premium Services
8am - 6pm ET, Mon - Fri

Fidelity.com
800-544-5555
800-544-4442

---

## Fidelity Account #  ___920    MARSHALL CARO - INDIVIDUAL TOD

### Account Summary

| | |
|---|---|
| Beginning value as of Jul 1 | $1,643.07 |
| Additions | 53.63 |
| Change in investment value | 0.28 |
| Ending value as of Jul 31 | $1,696.98 |

Your commission schedule   Silver
Account eligible trades from Aug 2009 - Jul 2010   0

### Income Summary

| | This Period | Year to Date |
|---|---|---|
| **Taxable** | | |
| Dividends | $0.04 | $1,397.07 |
| **Tax-exempt** | | |
| Dividends | 0.01 | 2.08 |
| **Total** | $0.05 | $1,399.15 |

### Holdings (Symbol) as of July 31, 2010

| | Quantity July 31, 2010 | Price per Unit July 31, 2010 | Total Cost Basis | Total Value July 1, 2010 | Total Value July 31, 2010 |
|---|---|---|---|---|---|
| **Mutual Funds 1% of holdings** | | | | | |
| M PRUDENTIAL HIGH YIELD CLASS A (PBHAX) | 1.665 | $5.390 | unknown | $8.38 | $8.85 |
| **Core Account 99% of holdings** | | | | | |
| FIDELITY CT MUNICIPAL MONEY MKT (FCMXX) | 1,588.330 | 1.000 | not applicable | 1,534.69 | 1,588.33 |
| *7-day Yield: 0.01%* | | | | | |
| **Total Market Value** | | | | | $1,596.98 |

*M - Position held in margin account.*

Page 1 of 4





**Fidelity** INVESTMENTS

*Premium Services*

Envelope 903660020

MARSHALL CARO
47 ANGELUS DR
GREENWICH CT 06831-3534

**Investment Report**

June 1, 2010 - June 30, 2010

Online
FAST(sm)-Automated Telephone
Premium Services
8am. - 8pm ET, Mon - Fri

Fidelity.com
800-544-5555
800-544-4442

---

▲ **Fidelity Account** sm... 020   **MARSHALL CARO - INDIVIDUAL TOD**

Starting in October 2010, U.S. mail delivery of trade confirmations for all brokerage and mutual fund trades made on the same day in accounts within the same statement household will be sent in one consolidated mailing, rather than individual mailings. If you have any questions or want to opt out of all consolidated mailings, please call 800-544-6666.

**Account Summary**

| | |
|---|---|
| Beginning value as of Jun 1 | $1,471.09 |
| Additions | 71.88 |
| Change in investment value | 0.10 |
| Ending value as of Jun 30 | $1,543.07 |

Your commission schedule: Silver
Account eligible trades from Jul 2009 - Jun 2010: 0

**Income Summary**

| | This Period | Year to Date |
|---|---|---|
| Taxable | | |
| Dividends | $0.04 | $1,397.03 |
| Tax-exempt | | |
| Dividends | 0.01 | 2.07 |
| Total | $0.05 | $1,399.10 |

**Holdings** (Symbols 1% of holdings)

| Description June 30, 2010 | Quantity June 30, 2010 | Price per Unit June 30, 2010 | Total Cost Basis | Total Value June 1, 2010 | Total Value June 30, 2010 |
|---|---|---|---|---|---|
| **Mutual Funds 1% of holdings** | | | | | |
| M PRUDENTIAL HIGH YIELD CLASS A (PBHAX) | 1.507 | $5.620 | unknown | $8.28 | $8.38 |
| **Core Account 99% of holdings** | | | | | |
| FIDELITY CT MUNICIPAL MONEY MKT (FCMXX*) 7-day Yield: 0.01% | 1,534.690 | 1.000 | not applicable | 1,462.80 | 1,534.69 |

Page 1 of 4

0601   ...   100630 0001 903460029   0416 000



**Fidelity**
INVESTMENTS

*Premium Services*

Envelope 9003327359

MARSHALL CARO
47 ANGELUS DR
GREENWICH CT 06831-3634

**Investment Report**

May 1, 2010 - May 31, 2010

Online        Fidelity.com
FAST(sm)-Automated Telephone   800-544-5555
Premium Services   800-544-4442
8am - 8pm ET, Mon - Fri

## Fidelity Account  xxx  20   MARSHALL CARO - INDIVIDUAL TOD

**Account Summary**

| | |
|---|---|
| Beginning value as of May 1 | $1,251.53 |
| Additions | 80.41 |
| Change in investment value | 139.15 |
| Ending value as of May 31 | $1,471.09 |

Your commission schedule  Silver
Account eligible trades from Jun 2009 - May 2010   0

**Income Summary**

| | This Period | Year to Date |
|---|---|---|
| Taxable | | |
| Dividends | $139.46 | $1,386.99 |
| Tax-exempt | | |
| Dividends | 0.01 | 2.06 |
| Total | $139.47 | $1,399.05 |

**Holdings** (Symbols as of May 31, 2010)
*Mutual Funds 1% of holdings*

| | Performance May 31, 2010 | Quantity May 31, 2010 | Price per Unit May 31, 2010 | Total Cost/Basis | Total Value May 1, 2010 | Total Value May 31, 2010 |
|---|---|---|---|---|---|---|
| ▾ PRUDENTIAL HIGH YIELD CLASS A (PBHAX) | | 1,589 | $5.190 | unknown | $8.29 | $8.29 |
| Core Account 99% of holdings | | | | | | |
| FIDELITY CT MUNICIPAL MONEY MKT (FCMXX) | 7-day Yield: 0.01% | 1,462.600 | 1.000 | not applicable | 1,243.24 | 1,462.80 |
| **Total Market Value** | | | | | | $1,471.09 |

*M - Position held in margin account.*

0001  |||||...||||  100528 0001 903327359      04 18 000A

# Fidelity
INVESTMENTS

*Premium Services*

Envelope 9023 8t1394
||||i|||i||i||i||i||||i||i||i|||u|i|i||u|i||||u|i||i||i||u||i|
MARSHALL CARO
47 ANGELUS DR
GREENWICH CT 06831-3534

## Investment Report

April 1, 2010 - April 30, 2010

Online                          Fidelity.com
FAST(sm)-Automated Telephone    800-544-5555
Premium Services                800-544-4442
8am - 8pm ET, Mon - Fri

---

## Fidelity Account    MARSHALL CARO - INDIVIDUAL TOD

### Account Summary

| | |
|---|---|
| Beginning value as of Apr 1 | $69,423.60 |
| Additions | 80.76 |
| Transfers between Fidelity accounts | -69,023.98 |
| Change in investment value | 765.15 |
| Ending value as of Apr 30 | $1,251.53 |

Your commission schedule   Silver
Account eligible trades from May 2009 -    0
Apr 2010

### Income Summary

| | This Period | Year to Date |
|---|---|---|
| Taxable Dividends | $57.11 | $1,257.53 |
| Tax-exempt Dividends | 0.04 | 2.05 |
| **Total** | **$57.15** | **$1,259.58** |

### Holdings (Excludes as of April 30, 2010)

**Mutual Funds *% of holdings***

M PRUDENTIAL HIGH YIELD CLASS A (PBHAX)

| | Performance April 30, 2010 | Quantity April 30, 2010 | Price per Unit April 30, 2010 | Total Cost Basis | Total Value April 1, 2010 | Total Value April 30, 2010 |
|---|---|---|---|---|---|---|
| PRUDENTIAL HIGH YIELD CLASS A (PBHAX) | | 1.537 | $5.400 | unknown | $1,148.36 | $8.29 |

**Core Account *99% of holdings***

FIDELITY CT MUNICIPAL MONEY MKT (FCMXX)    7-day Yield: 0.01%

| | | Quantity | Price per Unit | Total Cost Basis | Total Value | Total Value |
|---|---|---|---|---|---|---|
| FIDELITY CT MUNICIPAL MONEY MKT (FCMXX) | | 1,243.240 | 1.000 | not applicable | 5,613.64 | 1,243.24 |

**Total Market Value**        $1,251.53
M - Position held in margin account.



0001   ||i|i||i||i|i||i||i|||i||i||i||i||i|||i|||  100430 0601 90238139-    04 1B  000

**U.S. Postal Service**
**CERTIFIED MAIL.. RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | | |
|---|---|---|
| Postage | $ $0.61 | 0831 |
| Certified Fee | $2.80 | 07 |
| Return Receipt Fee (Endorsement Required) | $0.00 | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | $0.00 | |
| Total Postage & Fees | $ $3.41 | 09/08/2010 |

Sent To *Rothfarb Law PLLC*
Street, Apt. No.; or PO Box No. *John S Rothfarb 110 Wall Suites*
City, State, ZIP+4 *New York NY 10004*

PS Form 3800, August 2006          See Reverse for Instructions

---

**U.S. Postal Service**
**CERTIFIED MAIL.. RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com®

OFFICIAL USE

| | | |
|---|---|---|
| Postage | $ $0.61 | 0831 |
| Certified Fee | $2.80 | 07 |
| Return Receipt Fee (Endorsement Required) | $0.00 | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | $0.00 | |
| Total Postage & Fees | $ $3.41 | 09/08/2010 |

Sent To *Fidelity Investments*
Street, Apt. No.; or PO Box No. *100 Crosby Plaza - KCID*
City, State, ZIP+4 *Covington, KY 41015-0234*

PS Form 3800, August 2006          See Reverse for Instructions